Thomas J. BYRNES and Francis R. Santangelo, Plaintiffs,

v.

FAULKNER, DAWKINS & SULLIVAN and Singer & Mackie, Inc., Defendants.

FAULKNER, DAWKINS & SULLIVAN, Counterclaim-Plaintiff,

v.

Thomas J. BYRNES et al., Counterclaim-Defendants.

No. 73 Civ. 670 (HFW).

United States District Court, S. D. New York.

Feb. 26, 1976.

Amended April 8, 1976.

Carro, Spanbock, Londin, Rodman & Fass, New York City, for Byrnes and Santangelo, plaintiffs and counterclaim defendants; Reginald Leo Duff, New York City, of counsel.

Jacobs, Persinger & Parker, New York City, for Faulkner, Dawkins & Sullivan, defendant and counterclaim plaintiff; I. Michael Bayda and Norman Trabulus, New York City, of counsel.

Hall, Dickler, Lawler, Kent & Howley, New York City, for Tobey & Kirk, counterclaim defendant; Gerald A. Kaufman, New York City, of counsel.

Securities and Exchange Commission, Washington, D. C., as amicus curiae; Lawrence E. Nerheim, Paul Gonson, Charles E. H. Luedde, Susan P. Starling, Washington, D. C., of counsel.

## OPINION

WERKER, District Judge.

The original complaint in this case was filed by Thomas J. Byrnes and Francis R. Santangelo ("Byrnes") against Faulkner, Dawkins & Sullivan ("Faulkner") and Singer & Mackey, Inc. ("Singer") in Supreme Court, New York County alleging breach of contract. The complaint alleged that on June 7, 1971, Byrnes made a contract to sell, pursuant to a registration statement, 44,000 shares of the common stock of White Shield Corporation ("White Shield") to Faulkner and Singer but that Faulkner and Singer repudiated the contract without just cause. A more complete statement of the underlying facts and the prior history of the case are contained in an earlier opinion written by the Honorable Judge Murray Gurfein, now Circuit Court Judge, reported at 362 F.Supp. 864 (S.D.N.Y.1973).

In that opinion, Judge Gurfein dismissed for lack of subject matter jurisdiction an action brought by Byrnes for a judgment declaring that the affirmative defenses asserted by Faulkner in the state court action were insufficient as a matter of law. However, Judge Gurfein did find that federal jurisdiction existed over the counterclaims which Faulkner asserted in its answer to Byrnes' action under § 17 of the Securities Act of 1933 ("1933 Act") and § 10 of the Securities Exchange Act of 1934 ("1934 Act").[1] Judge Gurfein granted Byrnes leave to answer the counterclaim of Faulkner and to assert his own counterclaim, suggesting that the breach of contract claims which formed the basis of the original suit would be cognizable in federal court as compulsory counterclaims under the Federal Rules of Civil Procedure, Rule 13(a).

Following this decision Faulkner did not submit additional papers but relied on its original answer as filed. Byrnes answered Faulkner's counterclaims and filed its own counterclaims. Faulkner's original answer had also stated two counterclaims against Tobey & Kirk, Byrnes' broker, which Tobey & Kirk answered without asserting any counterclaims. Although technically the designation of the parties as plaintiff and defendant should be changed to indicate their current posture, each of the parties has continued to use the original designation. To avoid confusion, the court has also adopted this nomenclature. Thus, Byrnes and Santangelo are hereinafter referred to as plaintiffs and counterclaim-defendants; Faulkner is the defendant and counterclaim-plaintiff; Tobey & Kirk is also a counterclaim-defendant.

The parties have made cross motions. Byrnes moved to dismiss all of Faulkner's affirmative defenses and counterclaims and for summary judgment on Byrnes' prayer for a declaratory judgment. Faulkner moved for summary judgment on all of its affirmative defenses except the first and sixth, on its first counterclaim, and on Byrnes' counterclaim. Tobey & Kirk moved for summary judgment dismissing Faulkner's counterclaims against it. Since Tobey & Kirk's motion incorporated by reference the memorandum submitted by the plaintiffs in support of their motion and provided no additional independent authority each of the motions with respect to dismissal of Faulkner's Second and Third Counterclaims will be treated as one motion made by all counterclaim-defendants.[2]

---

**1.** It should be noted here that Singer withdrew from its answer in the federal action all of its counterclaims asserted by it in the state court action. Judge Gurfein therefore dismissed the action as to it.

**2.** The court feels constrained to make some comments about the submissions which have been received with respect to these motions.

Excluding the affidavits and exhibits the parties originally filed almost 600 pages of motion papers. While the motions were *sub judice* nearly 50 additional pages in the form of correspondence and amended submissions were received. It is the court's view that most of the papers were needlessly verbose and that the repeated bombardment of the court with addi-

## FAULKNER'S FIRST AFFIRMATIVE DEFENSE AND THIRD COUNTERCLAIM

Faulkner's First Affirmative Defense and Third Counterclaim assert that Tobey & Kirk represented to it that the shares of White Shield which Faulkner agreed to buy were not part of a registered distribution. Faulkner asserts further that in agreeing to buy the shares, it relied on that representation which was false and fraudulent when made and in violation of § 17 of the 1933 Act [3] and § 10(b) of the 1934 Act.[4] Faulkner raises this as a defense to plaintiffs' claim and also seeks to recover damages for the expenses incurred and profit lost on the cancelled resale to Singer & Mackey.

The plaintiffs seek summary judgment on this defense and counterclaim on the ground that there are no material issues of fact to be tried. They assert that the testimony of all of the parties to this transaction negates any thought that fraudulent representations were made as to the status of the stock offered to Faulkner. Faulkner, on the other hand, contends that there were fraudulent and material misrepresentations made, that the facts are in sharp dispute, and that summary judgment with respect to this defense is inappropriate.

■ Section 17 of the 1933 Act makes it unlawful for any person selling securities to engage in any practice which operates as a fraud upon the purchaser. Section 10(b) of the 1934 Act makes the use of a deceptive device in connection with the purchase or sale of securities unlawful. These sections cover transactions in the over-the-counter market. *American Bank & Trust Co. v. Barad Shaff Securities Corp.*, 335 F.Supp. 1276 (S.D.N.Y.1972).

■ The parties seem to agree, as does the court, that failure to disclose the fact that stock is, in fact, registered stock is a material omission. *Cf. Vohs v. Dickson,*

495 F.2d 607 (5th Cir. 1974). This is particularly true in light of *In the Matters of Jaffee & Co.* [1969–1970 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 77,805 (1970), discussed later in this opinion, in which the SEC required a market maker to cease all open-market purchases of a security if it purchased any shares which were being sold as part of a distribution. The issue is whether in fact there was such an omission.

■ The parties have each cited several sections of the testimony taken at depositions and assert that such testimony confirms or refutes the allegations on disclosure. The evidence before the court clearly is inconclusive. The issue is largely a question of credibility, a matter which cannot be determined on the pleadings in a motion for summary judgment. *Cross v. United States*, 336 F.2d 431 (2d Cir. 1964); *Hirsch v. Archer-Daniels-Midland Co.*, 258 F.2d 44 (2d Cir. 1958).

In addition, the plaintiffs argue that Faulkner, which believed it would be dangerous for a market maker to buy stock which was being sold as part of a distribution, was under an obligation to inquire as to the status of the stock being sold. The plaintiffs cite *In the Matters of Jaffee & Co., supra*, in support of their position. In that case, where the trader employed by a market maker had received a copy of a prospectus of the stock being sold, the SEC held that the market maker "should have inquired into the status of the offering." *Id.* at 83,858. That case is not dispositive of this one, however, since there is direct evidence that Faulkner did not receive a copy of the White Shield prospectus prior to the sale.

Because the facts are in sharp dispute as to both the fact of omission and extent of Faulkner's inquiry as to the status of the stock, plaintiffs' motion for summary judgment on Faulkner's First Affirmative Defense is denied.

tional material, heated correspondence, and reiterations of prior material served only to extend an already protracted proceeding.

3. 15 U.S.C. § 77q.

4. *Id.* § 78j(b).

## SECOND AFFIRMATIVE DEFENSE

All parties have sought summary judgment with respect to Faulkner's Second Affirmative Defense. That defense asserts that the sale of White Shield stock was illegal because the written comparison[5] sent to Faulkner by Tobey & Kirk constituted a prospectus as defined in § 2(10) of the 1933 Act which did not conform to the requirements of § 10 of that Act and because that comparison was not accompanied or preceded by a statutory prospectus as required in § 5(b) of that Act. The plaintiffs acknowledge that no prospectus was sent to the defendant but assert that the requirements of Section 5(b) do not apply to transactions between broker dealers and that in any event, the comparison Tobey & Kirk sent does not constitute a prospectus for the purposes of the 1933 Act.

Section 5(b)(1) of the 1933 Act[6] makes it unlawful for any person, directly or indirectly—(1) to make use of any means . . . of . . . communication in interstate commerce . . . to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed . . . unless such prospectus meets the requirements of section 77j of this title.

There is no question that the comparison sent by Tobey & Kirk does not meet the requirements of section 77j[7] which requires a prospectus to contain the information contained in the registration statement.

The real issue is whether the comparison is a prospectus at all such that the requirement in section 5(b) is even applicable. Section 77b(10) of 15 U.S.C.[8] defines the term prospectus as "any . . . communication, written . . . which . . . confirms the sale of any security." Taken literally, the statute which is broad and inclusive, would seem to include a comparison sent by one broker to another, confirming the sale of a security.

■ The plaintiffs, however, have raised several objections to this reading. First, they argue that the 1933 Act in which the above-quoted language is contained was intended to regulate transactions between broker dealers and their customers, i. e., the public, not the activities among broker dealers themselves. That relationship, the argument goes, is fully regulated by the 1934 Act. With that assertion, this court cannot completely agree.

■ The court recognizes that the primary purpose of the Act is to protect the investing public. *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953); *Securities and Exchange Commission v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *Berko v. Securities and Exchange Commission*, 316 F.2d 137 (2d Cir. 1963). However, the statute itself seems to negate the plaintiff's argument by its own language.

■ Section 5 of the 1933 Act[9] which is the heart of the statute makes it unlawful for *any person* to do any of the acts therein prohibited. Section 2(2) of the Act[10] defines "person" to mean "an individual, a corporation, a partnership, an association, etc." The plaintiffs admit that neither they nor Tobey & Kirk is excluded from the reach of that definition. Thus they concede that it would have been unlawful to deliver the shares of White Shield stock unaccompanied by an official prospectus. Section 5 of the Act admittedly covers transactions between brokers.

---

5. The terminology involved in this defense is somewhat tricky. For the purpose of clarity, unless the context indicates otherwise, the word "comparison" as used in this opinion will refer to the communication exchanged by brokers as required by § 9 of the NASD Uniform Practice Code, and the word "confirmation" will refer to the communication sent by a broker to his customer confirming the sale of securities for the customer's account.

6. 15 U.S.C. § 77e(b)(1).

7. § 10 of the 1933 Act.

8. § 2(10) of the 1933 Act.

9. 15 U.S.C. § 77e.

10. *Id.* § 77b(2).

■ Further evidence that the 1933 Act did not intend to cover only the relationship between brokers and the public can be found in Section 4.[11] Section 4 provides that certain transactions shall be exempted from the application of Section 5. There is no such exemption *per se* for transactions between two broker dealers. Surely if the Congress intended to relieve these parties of responsibility under the 1933 Act, it would have done so in this section. The court therefore concludes that the plaintiffs cannot avoid the requirements of Section 5(b) on the ground that Tobey & Kirk and Faulkner are both broker dealers.

Second, the plaintiffs argue that an examination of the legislative history of Section 2(10) [12] supports its contention that the term prospectus was not intended to include a comparison sent from one broker dealer to another. The original act defined a prospectus as a "communication . . . which offers any security for sale." In 1954, the statute was amended to include within the term prospectus, any communication which "confirms the sale of any security." Both the Senate and the House reports explain that the addition of these words was "to avoid any implication of departure from settled interpretations that confirmations are 'prospectuses'." S.Rep. No.1036, 83d Cong., 2d Sess. 12 (1954); H.R.

Rep.No.1542, 83d Cong., 2d Sess. 21 (1954), U.S.Code Cong. & Admin.News 1954, pp. 2973, 2994. Both reports contain citations to SEC Securities Act Release No. 2623 (July 25, 1941).

The release, an opinion by the General Counsel, explains what he considers to be the scope of the term prospectus:

"Under the Act a 'prospectus' includes every kind of written communication which attempts or offers to dispose of, or solicits an offer to buy, a security for value, or which constitutes a contract of sale or disposition of a security for value. If the term 'prospectus' is construed in accordance with its language and spirit, it must in my opinion be read to cover any document which is designed to procure orders for a security, or to effectuate the disposition of a security, whether or not the document purports on its face to offer the security for sale, or otherwise to dispose of it for value." *Id.* at 3129.

The release continues by giving concrete examples of situations which might arise and by explaining what the prospectus delivery requirements are in each case. The plaintiffs place heavy reliance on examples 7 through 10 which purport to relieve a broker of the requirements of delivering a prospectus in circumstances analogous to those of the case at bar.[13]

---

11. *Id.* § 77d.

12. *Id.* § 77b(10).

13. *Question 7.* Richard Roe telephones John Doe, his broker, and states that he has certain warrants which he would like John Doe to sell for his account. John Doe does so, and sends him a confirmation of the transaction. Must John Doe at the same time send him a copy of the prospectus?
*Answer.* No. In confirming a sell order on a brokerage basis, John Doe is not within the prospectus requirements of the Act.
*Question 8.* Pursuant to the sell order received in Question 7, John Doe sells Richard Roe's warrants to Henry Hoe, another dealer, who purchases for his own account. Must John Doe, in confirming the sale to Henry Hoe, or in delivering the warrants to him, send him a copy of the prospectus?
*Answer.* No. John Doe, in making the sale, is completing the execution of an unsolicited bro-

kerage order, and therefore is exempt from the prospectus requirements.
*Question 9.* John Doe writes to his customer Richard Roe, whom he knows to be a stockholder of American Telephone and Telegraph Company and offers to sell for him the warrants he has received. Must John Doe send Richard Roe a formal prospectus with his letter?
*Answer.* No, since he is offering to sell *for* him, not *to* him.
*Question 10.* As a result of the letter described in Question 9 Richard Roe gives John Doe a sell order, and John Doe sells the rights to Henry Hoe. When he mails the warrants to Henry Hoe, must he send a copy of the prospectus with them?
*Answer.* Yes. The transaction, although on a brokerage basis, results from a solicitation, and consequently the prospectus requirements are applicable to John Doe's sale to Henry Hoe. *Id.* at 3130–31. (emphasis in original) (footnotes omitted).

Those questions and answers do not provide the plaintiffs with the authority they seek for two reasons. They deal on their face with brokers' transactions as exempted from compliance with section 5 by the terms of section 4. The trade in question is not such a transaction. Second, the questions and answers relied upon have in part been superseded. CCH Fed. Sec. L. Rep. ¶ 3195 at 3131 n.2.

The plaintiffs seek support from this series of questions to illustrate the unsolicited nature of the transaction in an attempt to avoid the application of the definition of the term "prospectus" to the comparison sent by Tobey & Kirk. The theory propounded is that in adding the words "or confirms the sale of any security" the Congress intended to encompass only those situations where some act by the seller could be considered a solicitation to buy the stock.

There is some support for this view had this transaction been conducted as a result of a customer's solicitation. Questions 7 through 10 indicate that where a broker sells securities to another broker at the request of the selling broker's customer, the transaction is unsolicited and therefore exempt from section 5.

Questions 8 and 10 were superseded by 17 C.F.R. § 230.154. Under that regulation, a broker was deemed not to solicit an order when, in response to a quotation submitted by a dealer in the "sheets," he inquired of that dealer as to his interest in purchasing. Such a solicitation within 60 days of the insertion of a bid in the sheets was deemed not to disqualify an otherwise exempt broker's transaction under section 4. SEC Securities Act Release No. 131 (March 13, 1934).

Rule 154 was subsequently rescinded when Rule 144 was adopted.[14] Although the Rule is directly concerned with the public resale of restricted securities without registration, the new rule retained a similar provision regarding the availability of a broker's exemption to a broker who offers to sell restricted securities to a broker or dealer who had indicated an interest in that security during the preceding 60 days. SEC Securities Act Release No. 5223 (January 11, 1972). Presumably, such an indication of interest would include the insertion of a bid in the sheets. Rule 144 deems such a transaction as unsolicited.

■ There is a basic problem with this analysis, as applied to the instant case. Each of the releases which dealt with the concept of unsolicited orders did so in the context of a broker's exemption from section 5, not in consideration of whether a particular communication constituted a prospectus. Presumably, the sending of a document that clearly was a prospectus would not alter the determination as to whether or not a particular transaction was exempt. The point of these releases is that offering to sell a security to a broker who has inserted quotations in the sheets does not constitute a solicitation, regardless of the form in which that offer is made. That still does not contradict the language in section 2(10) that defines a prospectus as any written communication which confirms the sale of a security irrespective of the status of the transaction in which it is used. The court therefore rejects the argument, based on questions 7 through 10 of the General Counsel's opinion that a comparison does not constitute a prospectus for the purposes of Section 2(10).

■ There is one statement, however, in the Senate Reports cited above that lends stronger support to the position taken by the plaintiffs that the comparison sent by Tobey & Kirk to Faulkner is not to be deemed a prospectus for purposes of the 1933 Act. The report discusses certain amendments to the 1933 Act made in 1954 and in the context of explaining an amendment which shortened the period during which transactions, by dealers not participating in the distribution, were not exempt from the provisions of section 5 of the Act, the report included this statement: "Section 5(b) of the Securities Act requires that all persons, unless exempt, use prospectuses in connection with the sale *to the public* of

14. SEC Securities Act Release No. 5223 (Jan. 11, 1972).

a registered security." S.Rep.No.1036, 83d Cong., 2d Sess. 6 (1954) (emphasis added). It can certainly be argued that that is a recognition, at least by the Committee on Banking and Commerce, as constituted on February 25, 1954, that the prospectus delivery requirement in section 5(b)(1) was not intended to include comparisons exchanged by brokers. Nonetheless, this is insufficient authority to counteract what is otherwise clear statutory language. And it is a well-known maxim that the party who seeks to contradict the clear and unambiguous language of a statute must bear the burden of convincing the court that the interpretation he proposes is the correct one.[15]

A third basis upon which the plaintiffs argue that the comparison sent by Tobey & Kirk does not constitute a prospectus is the inconsistency between the regulations regarding the contents of comparisons as prescribed at 17 C.F.R. § 240.15cl–4 (1975) and the rule covering broker confirmations promulgated by the National Association of Securities Dealers (NASD) in sections 9 through 11 of the Uniform Practice Code. That is an argument which in this court's opinion, is devoid of merit.

■ First, it would seem to be stating the obvious to point out that the documents which meet the definition of prospectus in section 2(10) of the Act will be of infinite variety. It can hardly be argued that a certain document is not a prospectus merely because it is different from a second document which clearly is a prospectus. Thus, merely because a broker's comparison is not the same as a confirmation to a customer which all of the parties admit is a prospectus within the meaning of the Act is not to say that it therefore cannot be a prospectus.

■ Furthermore, the regulations cited by the plaintiffs to describe the contents of a confirmation are not at all relevant to the definition of prospectus. Section 15(c)(1) of the 1934 Act[16] directed the Commission to enact "rules and regulations (to) define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent" for the purposes of that Act. It was pursuant to this authorization that the Commission promulgated 17 C.F.R. § 240.15cl–4 (1975). That regulation defines as fraudulent, manipulative or deceptive

"any act of any broker or dealer designed to effect with or for the account of a customer any transaction in . . . any security . . . unless such broker or dealer, at or before the completion of each such transaction, gives or sends to such customer written notification disclosing"

certain facts regarding the capacity in which the broker or dealer is functioning in that particular sale. It should be apparent that these sections work independently of each other. If a broker sent a confirmation which clearly violated this rule but which was accompanied by a prospectus that complied with section 10 of the 1933 Act, he would not violate section 5(b)(1) of that Act. Similarly, if he sent a confirmation which complied in full with the disclosures mandated by Rule 15cl–4 but which was not accompanied or preceded by a section 10 prospectus, he would be in violation of Section 5 of the 1933 Act. Thus it is the opinion of this court that it would be erroneous to make any assumptions about the category of documents which fall under the term prospectus by referring to the description of the confirmation contained in 17 C.F.R. § 240.15cl–4.[17]

It is for that same reason that this court will not automatically exclude from the term "prospectus" that document which is

15. *Commissioner of Internal Revenue v. Barclay Jewelry, Inc.*, 367 F.2d 193 (1st Cir. 1966).

16. 15 U.S.C. § 78o(c)(1).

17. By the same token, it is irrelevant for the purposes of section 2(10) of the 1933 Act that 17 C.F.R. § 240.15cl–1 excludes brokers and dealers from the term customer. Such an exclusion merely harmonizes the regulation under the 1934 Act with the NASD rules and avoids the finding otherwise compelled that it is a manipulative device for a broker to confirm a transaction entered into with another broker, by using the comparison defined by sections 9–11 of the NASD Uniform Practice Code.

described in §§ 9–11 of the NASD Uniform Practice Code as a confirmation or comparison. The Code prescribes the contents of the comparisons to be exchanged by brokers and the time by which they must be sent. It must be apparent here also that this regulatory scheme operates independently of section 5(b)(1) of the 1933 Act. Assuming *arguendo* that a comparison as defined in §§ 9–11 of the NASD Uniform Practice Code does constitute a prospectus for the purposes of section 2(10) of the 1933 Act, it is clear that it is possible to violate the Code without violating Section 5 and vice versa. Thus, reference to the NASD rules does not, in this court's view, resolve the question posed by the defendant's Second Affirmative Defense.

The plaintiffs also argue that compliance with the NASD time schedule and the Section 5 prospectus delivery requirements is virtually physically impossible. Section 9 of the Practice Code requires the confirmation to be sent "on or before the first full business day following the date of the transaction." The plaintiffs argue that it is likely that the final prospectus will not be available by the time the selling broker must send the comparison.

That argument puts the procedural cart before the statutory horse. If the 1933 Act prohibits the sending of a communication which confirms the sale of a security unless accompanied or preceded by a final prospectus, it is not a defense to a violation of that statute to hold up the NASD Manual which requires the comparison to be sent one day after the sale. It will be the responsibility of selling brokers to comply with both provisions by delaying the consummation of any sale to another broker until the prospectus delivery requirements can be met within the time allowed by NASD.

In an *amicus* brief which the SEC filed in this action it argues that plaintiffs' fears as to the unavailability of a final prospectus are spurious, and it refers to Rule 153 which requires that an adequate number of copies of a prospectus covering a security listed on a national securities exchange be available at the exchange with respect to transactions in that security on that exchange. It is unclear to the court what relationship that has to the problem raised by the plaintiffs regarding over-the-counter transactions and it rejects that as a basis for dismissing the plaintiffs' argument.

Byrnes and Santangelo seek to avoid the effect of any adjudged failure of Tobey & Kirk by disassociating themselves from the acts of the broker. They argue that they personally never sent any written confirmations to the defendant and that as far as they are concerned, the prospectus delivery requirements did not become effective as to them until they actually delivered the securities themselves. They argue that they should not be charged with any failure by Tobey & Kirk to fulfill its obligations under the 1933 Act.

It is accurate to say that had Byrnes and Santangelo sold the securities without the assistance of a broker and had they themselves not sent any written confirmation to evidence the making of the contract, they would not have had to deliver a prospectus to Faulkner until they actually physically delivered the shares of White Shield. But that is not the way the transaction took place, and the plaintiffs will not be heard to argue that they could have avoided an unfavorable result by structuring their affairs differently.

The Second Affirmative Defense does not seek to impose liability on Byrnes and Santangelo. Rather, it is asserted as a defense against an action for damages for breach of contract. It was established in the case of *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838 (2d Cir.), *cert. denied*, 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952), that a contract which violates the 1933 Act is unenforceable. In that case the court found that a prospectus issued by the plaintiff was misleading and therefore violated 15 U.S.C. § 77e(b) if used in connection with a public offering. As a result, the court found the defendant not liable for breach of its contract with the plaintiff to underwrite the issue. "[A] contract which violates the laws of the United States and contravenes the public policy as expressed in those laws

is unenforceable." *Id.* at 843. *Cf. Garfield v. Strain*, 320 F.2d 116, 119 (10th Cir. 1963). *See also Schillner v. H. Vaughan Clarke & Co.*, 134 F.2d 875 (2d Cir. 1943) in which the court held that "[i]n imposing by section 12(1) civil liability upon 'any person who * * * sells a security in violation of section 5' we cannot doubt that the liability was intended to embrace all transactions made unlawful by section 5." *Id.* at 878. *See also* III L. Loss *Securities Regulation* 1797–98 (1961). It is true that the remedies authorized by § 12 include only "recover[y of] the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or . . . damages if he no longer owns the security." However, as Professor Loss points out, "[t]here would be little point in giving the seller an action on his contract only to have the buyer put things *in statu quo ante* by counterclaiming or bringing his own action under . . . § 12." III Loss, *supra* at 1798.

It might be considered harsh to deny the plaintiffs the benefit of a contract because the court is imposing a prospectus delivery requirement which heretofore has never been judicially directed. "However, even where a [litigant] is successful in showing that it has followed a customary course in the industry, the first litigation of such a practice is a proper occasion for its outlawry if it is in fact in violation." *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1171 (2d Cir. 1970). Therefore, there being no issue of fact to be tried and defendant being entitled to judgment as a matter of law, the plaintiffs having failed to meet the burden of convincing the court to disregard the literal language of the statute, summary judgment is hereby granted on the Second Affirmative Defense and on the First Counterclaim to the extent it relates to this defense.

## THIRD AFFIRMATIVE DEFENSE

The defendant asserts as an affirmative defense the failure of White Shield to disclose in its prospectus that Tobey & Kirk was an underwriter as required by §§ 7 and 10 of the 1933 Act.[18] The plaintiffs dispute this on three grounds and seek to strike the defense as a sham. First, they argue that the prospectus makes an adequate disclosure by stating that the brokers through which the shareholders were selling their stock might be deemed to be underwriters. Second, they assert that even if Tobey & Kirk were an underwriter, the plaintiffs failed only to disclose a conclusion of law about which Faulkner had all of the relevant facts sufficient to draw its own conclusion. Thus, they claim there to be no failure to disclose a material fact. Third, it is the plaintiffs' contention that there is substantial doubt as to Tobey & Kirk's status as an underwriter. They assert that as soon as that status became clear they supplied a sticker amendment to the prospectus, a procedure which the SEC had specifically approved for their use.

The defendant rejects the plaintiffs' contentions on several grounds. First, it argues that the SEC permitted the use of sticker amendments only because the plaintiffs misrepresented the facts. It is the defendant's contention that it was clear several months prior to the publication of the prospectus that Tobey & Kirk were, in fact, underwriters of the proposed distribution and that had the SEC been apprised of that fact, it would have required disclosure of that fact. Second, it rejects the suggestion that Byrnes and Santangelo might not have been statutory underwriters because the plaintiffs have asked the court to infer that the plaintiffs obtained their stock for investment purposes only from the fact that they held their stock for three years. The defendant maintains that since the plaintiffs purchased their shares from a controlling person, they are deemed to purchase them with a view towards distribution and therefore cannot escape the adverse results resulting from their failure to identify Tobey & Kirk as an underwriter. Furthermore, the defendant seeks to avoid the con-

18. 15 U.S.C. §§ 77g, 77j.

tract under section 12(1) of the 1933 Act, thereby making the issues of materiality and knowledge irrelevant to the determination of its rights. Finally, it argues that since it does not attempt to impose any liability on the plaintiffs for their failure to disclose the identity of Tobey & Kirk as an underwriter, the issues of good faith and reliance should not be considered.

Because of the view this court takes as to the section of the statute which properly applies to this defense, it is unnecessary to reach most of the issues raised by the parties. The defendant argues that use of the White Shield prospectus which failed to identify Tobey & Kirk as an underwriter is a violation of § 12(1) of the 1933 Act, thereby making knowledge and materiality irrelevant. The plaintiffs assert that § 12(2) is the portion of the statute which provides the appropriate remedy. For the purposes of this argument only, the court will assume that Tobey & Kirk was an underwriter of this distribution and that the plaintiffs knew that fact in time to include it in the original prospectus.

Section 12 of the 1933 Act reads, in relevant part as follows:

Any person who—

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus, . . . which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), . . .

shall be liable to the person purchasing such security from him . . . .

It is the defendant's claim that using a prospectus which omits a material fact is a violation of subdivision (1) of this section. There is a logical argument which does yield that result. Section 77e outlaws the use of any prospectus which fails to conform to section 77j of the Act. Section 77j requires a prospectus to include, with certain exceptions not relevant to this contention, the information contained in the registration statement of that security. Section 77aa(5) [19] requires a registration statement to include the name and address of the underwriters. Thus the conclusion is that by omitting from the prospectus any information required to be included, the seller has *ipso facto,* violated subdivision (1) of section 12.

The problem in this court's view is that such an interpretation of the statute virtually eliminates any use for subdivision (2). If all omissions from a prospectus result in a violation of subdivision (1) there is no need to use subdivision (2). Since this court follows the rule that wherever possible statutes should be interpreted to avoid the conclusion that any portion of them is surplusage,[20] the interpretation urged by the defendant is rejected.

■ Rather, it is the view of this court that these two subdivisions were enacted to serve two distinct functions. Subdivision (1) creates virtually *per se* liability for anyone who commits the "grosser" violations which result from an absolute disregard of the mandate of section 5. Thus, subdivision (1) is violated where a person sends a security or attempts to sell a security through the use of interstate commerce or the mails if a registration statement is not in effect as to that security. That subdivision is also violated if a registered security is sent in interstate commerce unless accompanied or preceded by an official prospectus. That is the scope of section 12(1) of the 1933 Act.

---

**19.** Schedule A, Item 5 of the 1933 Act.

**20.** *McDonald v. Thompson,* 305 U.S. 263, 59 S.Ct. 176, 83 L.Ed. 164 (1938); *Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 479 F.2d 842, *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); *United States v. Bamberger,* 452 F.2d 696 (2d Cir. 1971), *cert. denied,* 405 U.S. 1043, 92 S.Ct. 1326, 31 L.Ed.2d 585 (1972).

*See* III L. Loss, *Securities Regulation* 1692–98 (1961).

Subdivision (2) which makes the burden of proof more stringent reaches the "finer" violations, *i. e.,* where the prescribed procedures are properly followed but where the documents employed do not satisfy the standards dictated.

The defendant cites *Securities & Exchange Commission v. Manor Nursing Centers, Inc.,* 458 F.2d 1082 (2d Cir. 1972), in support of their interpretation. But this court concludes that that case is distinguishable from the one at bar. In that case, facts which became known subsequent to the effective date of the registration statement were not incorporated into it by amendment. The district judge found that failure to do so resulted in the omission from the registration statement of certain items required to be included. *Securities & Exchange Commission v. Manor Nursing Centers, Inc.,* 340 F.Supp. 913, 934 (S.D.N.Y. 1971). On appeal, the Second Circuit held that where subsequent developments make the information false and misleading, it is a violation of section 5(b)(2) to deliver securities accompanied by a prospectus that has not been updated. The court held that the prospectus therein delivered failed to meet the requirements of § 10(a).

It is admitted that the original prospectus stated that the brokers acting for the selling shareholders might be deemed to be underwriters within the definition of that term in the 1933 Act. Furthermore, on June 18, 1971, White Shield filed a sticker amendment identifying Tobey & Kirk as one of the brokers who might be deemed an underwriter. If in fact Tobey & Kirk were an underwriter, it would seem to write § 12 (2) right out of the statute to find that such an omission in the original prospectus was a violation of § 10(a) thereby making the sale illegal, *per se,* under § 12(1). The discrepancy between the facts as presented in the prospectus prepared for the *Manor Nursing Centers* distribution and the facts as they actually existed was so tremendous that a

failure to amend the prospectus could be deemed an utter failure to provide a prospectus which conformed to § 10(a.). Such an argument cannot be applied to the circumstances of this case.

█ In order for the defendant to rely on the Third Affirmative Defense, two issues raised by the papers must be resolved: (1) was Tobey & Kirk in fact an underwriter and (2) if it was, were the defendants aware of that fact, thus foreclosing their reliance on this section as a basis for avoiding the contract. It is the court's view that these are issues of fact that cannot be resolved on a motion for summary judgment. Each of the parties, drawing opposing inferences from the facts, argue that the facts are not in dispute and that it is entitled to judgment as a matter of law. In view of the court's conclusion that § 12(2) is the applicable subdivision of the statute for determining the issue of liability for the alleged omission from the White Shield prospectus, the issue of knowledge is central to a determination. Furthermore, the court requires additional facts on the status of Tobey & Kirk. The court therefore denies both motions for summary judgment on defendant's Third Affirmative Defense.

Before leaving this matter, however, the court feels compelled to answer one further contention advanced by the plaintiffs: that § 19(a) of the 1933 Act [21] or § 23(a) of the 1934 Act [22] immunizes the plaintiffs from any violation of § 12(1) or (2) because they relied on the Commission's authorization in phrasing the statement on underwriters attacked by the defendant.

█ First, the defendant raises a significant factual question as to whether all of the facts relevant to Tobey & Kirk's status were in fact disclosed to the SEC. Unless that issue is resolved in plaintiffs' favor, they cannot rely on any authorization provided by the SEC. Second, it should be noted that by its own terms, the section relied on only immunizes the plaintiffs from liability imposed by either of the two Acts;

---

**21.** 15 U.S.C. § 77s(a).

**22.** *Id.* § 78w(a).

it does not protect them from any defense asserted in a breach of contract action. Thus, even assuming that all of the facts were in fact disclosed by the plaintiffs to the SEC, these sections are not applicable to the current dispute. It would be a wholly different matter if having requested and received SEC direction on a particular matter, the plaintiffs were then to be found liable in damages under one of the Acts for having followed those very directions. This court finds that the protection provided in § 19(a) of the 1933 Act and § 23(a) of the 1934 Act is unavailable in this instance.

## FOURTH AFFIRMATIVE DEFENSE and SECOND COUNTERCLAIM

One of the issues most sharply contested by these parties is the Fourth Affirmative Defense. The defendant contends that the sale by an issuer or underwriter of registered stock to a market maker is a manipulative device pursuant to Section 10(b) of the 1934 Act and Rule 10b–6 promulgated thereunder. It argues that the contract for the purchase of White Shield stock was therefore illegal and properly avoided. It is asserted that it was originally on this basis that Faulkner and Singer refused to perform the contract. This defense also serves as the basis for the defendant's Second Counterclaim. Faulkner seeks to recover its out-of-pocket expenses plus the net profit on the sales it purportedly had to cancel upon discovering that the White Shield stock was registered.

Two recent SEC decisions, *In the Matters of Jaffee & Co.* ("Jaffee"), CCH Fed. Sec. L. Rep. ¶ 77,805 (1970) and *In the Matter of Collins Securities Corp.* ("*Collins*"), SEC Securities Exchange Act Release No. 11,766 (October 23, 1975), are the focus for the arguments of each of the parties. In order to deal fully with their positions, it is necessary to discuss both cases in some detail.

In *Jaffee,* M. L. Lee & Co. ("Lee"), a broker dealer, was appointed the exclusive agent for 34 shareholders of Solitron Devices, Inc. ("Solitron") who wanted to sell their shares in a registered secondary offering. Among the selling shareholders was Wilton L. Jaffee, Jr. ("Jaffee") the principal partner in Jaffee & Company ("J. Co."). During the Solitron distribution, Greene & Company ("Greene"), a broker dealer who traded mainly for its own account entered bids, at the instigation of Jaffee, in the NASD quotation sheets, purchased Solitron stock in the over-the-counter market, and at the same time made purchases of Solitron stock that were not part of the offering. Greene had received a copy of the Solitron prospectus and thus was aware that a distribution of Solitron stock was in progress. The SEC concluded that Greene had engaged in a manipulative device in violation of Rule 10b–6 and that Lee had aided and abetted that violation when Greene bought and Lee sold it shares that were part of the distribution. The unusual and precedential aspect of *Jaffee* was its conclusion that any offering, registered pursuant to the Securities Act of 1933 was necessarily a distribution within the meaning of Rule 10b–6.

The *Collins* case involved an attempt by a registered broker dealer and a life insurance company ("Big Horn") to manipulate the price of the company's common stock. At a time when the market for the stock was extremely thin and the few quotes in the sheets ranged from 3 to 3½, the insurance company was in dire need of cash. After considering several alternatives for raising capital, the parties decided to encourage the exercise of outstanding stock purchase warrants. The problem with this means for raising cash was that the warrants were exercisable at $5.00 per share. Collins, by placing bid and asked quotations in the sheets which were one to two points higher than any of the other quotations, tried to stimulate the exercise of the warrants. When this tactic failed, it adopted a plan whereby fundamentally it exercised the warrants itself, paid the life insurance company the excessive price and took delivery of the newly issued shares. It then arranged to resell the shares to the public at the inflated prices it had originally created by inserting high bids in the sheets. Although the SEC found this activity violative of Rule 10b–6, it used this case to

explicitly overrule that part of *Jaffee* which held that "any offering of securities pursuant to a registration statement automatically constitutes a distribution within the meaning of Rule 10b–6." *Collins,* SEC Securities Exchange Act Release No. 11,766 at 256. Instead, the SEC held in *Collins* that the test articulated in *Bruns, Nordeman & Co.,* 40 SEC 652 (1961) is applicable to determine whether a sale of securities is in fact a distribution. Relying on the general lack of activity in Big Horn stock, the quantity and price of Collins' transactions in Big Horn and the fact that the number of shares offered comprised 30% of the outstanding stock, the SEC concluded that Collins had in fact participated in a distribution for the purposes of 10b–6.

Originally, Faulkner argued that the *Jaffee* rule was directly on point with the case at bar and mandated granting summary judgment in its favor. It now maintains that *Collins* should not change that result. Faulkner contends and the plaintiffs do not deny that the offering of White Shield stock constituted a distribution according to the *Bruns, Nordeman* standard. Once the existence of a distribution is proven, so Faulkner's argument goes, the *Jaffee* rule is automatically effective: any market purchase made during the participation in that distribution is violative of Rule 10b–6 as a manipulative device.

The plaintiffs had originally made three separate arguments: that the *Jaffee* case is sufficiently different so as not to control here; that even if it is on point the case does not sanction Faulkner's breach of its contract; that this court should overrule *Jaffee*. The decision in the *Collins* case has resulted in a change in this position. They argue that the impact of the *Collins* decision on the *Jaffee* rule is not as simple as the defendant claims. It is their position that in overruling the automatic determination on distributions, the *Collins* case necessarily overrules the *per se* finding of participation; rather, they argue that an inquiry must be made as to the nature and extent of the activities involved to determine whether or not there is actually "participation" in the subject distribution.

Section 10(b) of the 1934 Act[23] states that

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . .

(b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device . . . . .

Pursuant to the authorization contained in that section, the SEC promulgated Rule 10b–6[24] which defines acts which constitute a manipulative or deceptive device. Included in that rule is a prohibition for any person

"who has agreed to participate or is participating in such a distribution, directly or indirectly, by the use of any means . . . of interstate commerce . . to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series . . . until after he has completed his participation in such distribution . . . . .

As a preliminary matter, the plaintiffs argue that the SEC was confronted by a unique situation in *Jaffee* and that it articulated its unprecedented *per se* rule as the only available means of solving its problem. There was some evidence that Jaffee induced Greene to enter the sheets. However, by virtue of the SEC's own evidentiary rules, that evidence was admissible only against Jaffee. It is the plaintiffs' position therefore, that the SEC adopted a *per se* rule only because it could not base its finding on the manipulative intent it believed was actually motivating the parties' actions. Thus, the plaintiffs contend that *Jaffee* should not apply where the usual indicia of manipulation are not present. The only authority advanced by the plaintiffs in support of this contention is the opinion dis-

---

**23.** *Id.* § 78j(b).

**24.** 17 C.F.R. § 240.10b–6.

senting from the denial of reconsideration *en banc* in *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir. 1970), in which the dissenters argued against imposition of liability under Rule 10b–5 on the ground that where there are several market makers, the fear that one of them will be able to set an arbitrary price is inappropriate.

In promulgating Rule 10b–6 the SEC itself seems to have recognized that certain transactions, although falling within the literal language of the Rule may not in fact constitute manipulative devices. Thus the Rule provides at 17 C.F.R. § 240.10b–6(f) that the SEC may exempt certain transactions "as not constituting a manipulative or deceptive device or contrivance comprehended within the purpose of this section."

However, the Second Circuit in affirming the SEC's holding on Wilton Jaffee has flatly contradicted this view. The court held that

> The dangers of market manipulation that Rule 10(b)–6 was designed to eradicate . . . were continually present so long as Jaffee's purchases might have artificially inflated the price of Solitron, thereby affording him an opportunity to sell his registered stock at a price higher than he would have received if the market had been permitted to seek its own level. . . .
>
> . . . The rule proscribes and clearly defines a *practice* which had, prior to the adoption of the rule in 1955, been used fraudulently to distort the over-the-counter market. Where the rule applies, its prohibition is absolute . . . [T]he Commission's clear intent is to require actual manipulation or the like only to draw within the rule's ambit activity that would otherwise be exempted from it.

*Jaffee & Co. v. Securities & Exchange Commission,* 446 F.2d 387, 391 (2d Cir. 1971) (emphasis in original).

The practice to which the court was referring is the purchase of a security which is the subject of a distribution by any person who has agreed to participate or is participating in such distribution. This is the position asserted by the SEC in *Jaffee*

where it said, "Rule 10b–6 defines certain conduct as manipulative *per se* ; no further showing of manipulation is required in order to establish violations of the Rule." *Jaffee, supra* at 83,859. Thus, in order to find a violation of Rule 10b–6 the parties must have either committed one of the acts expressly proscribed by the Rule or committed some other act not within the ambit of the statutory language itself but which is manipulative *per se* or evidences a manipulative intent.

There is no question that Faulkner, as a market maker, would have been bidding for and purchasing and trying to sell the newly registered stock being distributed by the plaintiffs. The question is whether the purchase and resale of plaintiffs' stock constitutes the participation in a distribution which is prohibited by Rule 10b–6. The court is convinced that the sale of stock by the various White Shield shareholders did in fact constitute a distribution, pursuant to the test set out in *Bruns, Nordeman & Co.,* 40 SEC 652 (1961). Under that test, "a distribution is to be distinguished from ordinary trading transactions and other normal conduct of a securities business upon the basis of the magnitude of the offering and particularly upon the basis of the selling efforts and selling methods utilized." *Id.* at 660. *See also* Weiss & Leibowitz, *Rule 10b–6 Revisited,* 39 Geo.Wash. L.Rev. 474, 79–80 (1971) which states: "It is apparent from the Commission's decided cases that, irrespective of any other criteria relevant to the administration of other provisions of the federal securities laws, the term "distribution" in Rule 10b–6 extends to any special market operations a selling activity which constitutes a departure from casual trading." But that does not conclude the inquiry because it seems to this court that, as the plaintiffs argue, the real problem is whether or not Faulkner was participating in that distribution.

The answer to this question is dependent on the meaning of the words "or is participating in such distribution" in subdivision (3) of Rule 10b–6. The defendant argues that anyone who, whether by agree-

ment or otherwise, purchases distribution stock is *ipso facto* participating in that distribution. It then argues that such a person is prohibited from purchasing free market stock until he has sold all of the distribution stock he purchased. The plaintiffs take a more restrictive view. They argue that "is participating" must be read in conjunction with the words which immediately precede it: "has agreed to participate." It is their view that no one actually participates in a distribution unless they have already agreed to participate. They maintain that participation cannot be foisted unwittingly on anyone and that the determination of when a person completed his participation can only be meaningfully measured by reference to the extent of his agreed-to participation.

There are certain well known principles of securities law which favor the reading suggested by the defendant. First is the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly fits into the category of remedial legislation." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564, 569 (1967). *See also Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974); *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). Second, it is neither unusual nor unjust that persons are deemed to have done something or to have become something which they neither intended nor desired. *See, e. g.*, I L. Loss *Securities Regulation* 548–49 (1961). *Cf. Securities & Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (*en banc*), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Securities & Exchange Commission v. Chinese Consolidated Benevolent Association, Inc.*, 120 F.2d 738 (2d Cir. 1941). Furthermore, as has been noted earlier, the mere fact that a new interpretation imposes sanctions on business activity that was previously freely engaged in by members of the securities industry is not sufficient reason not to find illegality in that practice. *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167 (2d Cir. 1970). Finally, the statutory language is plainly in the alternative: "who has agreed to participate *or* is participating."[25] The court does not believe, as the plaintiffs have tried to argue, that this interpretation cannot be coordinated with Rule 10b–6(c)(3) which states that "[a] person shall be deemed to have completed his participation in a particular distribution as follows: . . . (iii) . . . when he has distributed his participation." It would not be unreasonable to hold that where a person whether by agreement or otherwise has begun his participation in a distribution he must cease all other market transactions until all of the distribution shares have been disposed of pursuant to 17 C.F.R. § 240.10b–6(c)(3)(iii).

The SEC in *Jaffee* seems also to have adopted the reading urged by the defendant:

"G Co. [Greene], which engages mainly in trading securities for its own account, purchased as principal through Horn over 25,000 shares of registered Solitron stock from Lee for resale. With every such purchase of stock and until such shares were resold, G Co., which received copies of the Solitron prospectus from Lee and thus was aware that a distribution of registered Solitron stock was in progress, became a participant in the distribution and subject to the prohibitions in Rule 10b–6. *Jaffee, supra* at 83,858.

Nonetheless, this court is not inclined to accept so readily this interpretation.

 First the SEC has at least misquoted, if not misread, Rule 10b–6 in reaching its decision in the *Jaffee* case. In deciding that Greene was a participant in the distribution, it read Rule 10b–6 to state that its prohibitions reach anyone who is participating directly or indirectly in a particular distribution. Then in reliance on the general rule that a " '[d]istribution' comprises 'the entire process by which in the course of a public offering the block of

---

**25.** Emphasis added.

securities is dispersed and ultimately comes to rest in the hands of the investing public.' " *R. A. Holman & Co. v. Securities & Exchange Commission*, 366 F.2d 446, 449 (2d Cir. 1966), it concluded that Greene was a participant in the distribution for purposes of Rule 10b–6. The problem is that the words "directly or indirectly" do not modify "is participating" as the SEC has quoted it in *Jaffee, supra* at 83,858. Rather, "directly or indirectly" modifies "bid for or purchase" which is separated from the words in question by several other modifiers. Weiss & Leibowitz, *Rule 10b6 Revisited*, 39 Geo.Wash.L.Rev. 474, 484–85 (1971); Trading During a Distribution, 4 *Rev. of Sec. Reg.* 990, 991 (1971). Reference to the Federal Register also confirms this reading. Each of the three subdivisions of Rule 10b–6(a) is set off from the body of the rule. 20 Fed.Reg. 5075 (1955). When the rule was reprinted in C.F.R., the separation must have been omitted in error. Thus subdivision (3) runs into the body of the rule, and the casual reader is apt to mistake the words directly or indirectly as part of that section. But the context as well as the original enactment indicate that reading to be in error. This court does not accept therefore the defendant's contention that it ought to defer to the agency's interpretation since that interpretation is based at least in part on a misreading of the statute.[26]

The *Collins* case speaks in terms of whether or not the purchases and sales of registered stock constitute a distribution. But its discussion of the activities of Collins and his company and its determination that in fact Rule 10b–6 had been violated focuses primarily on the nature and extent of its own particular role rather than the nature of the offering in general. It is this court's conclusion that there is a two-step inquiry: first, was the sale of stock by the issuer a distribution and second, if so, did the activities of Faulkner constitute participation in that distribution.[27]

Thus, in *Collins*, the SEC suggests that were an exchange specialist or a market maker to acquire registered stock in the performance of its normal functions, it would be an unwarranted extension of Rule 10b–6 and would cause an unnecessary disruption of market activities to find that acquisition to be violative of Rule 10b–6, thus requiring the specialist or market maker to get out of the market until he had disposed of the registered shares. In this court's opinion, this conclusion rests not on a finding that the original sale of the registered shares was not a distribution for the purposes of Rule 10b–6, but rather on the conclusion that the activities of the market maker or specialist did not constitute participation in that distribution.

In the case at bar, Faulkner contracted with Tobey & Kirk, the underwriter for some of the selling shareholders, to purchase 44,000 shares of White Shield, an amount which constitutes about 10.4% of

**26.** It seems reasonable to conclude, on the basis of the *Collins* decision that the SEC itself believed the reading of Rule 10b–6 in *Jaffee* to be erroneous. Nonetheless, it submitted an *amicus* brief urging the court to grant summary judgment to the defendant. To avoid reaching the question of the validity of *Jaffee* itself or its direct applicability to the case at bar, the SEC adopted a strained reading of Section 19(a) of the Securities Act and Section 23(a) of the Securities Exchange Act to make those sections cover the defendant's potential liability in a breach of contract action. Furthermore, without so much as a hint of the decision to come, a footnote in that *amicus* brief at 27 said, "[t]he Commission presumably would have the authority to reinstate the prohibitions of Jaffee they [sic] express amendment of Rule 10b–6 or through the adoption of a new rule." This court has been informed that the *Collins* case was argued before the SEC on February 8, 1974 more than one year and three months before the filing of the *amicus* brief in this case. It is inconceivable that at the time that brief was filed the SEC sincerely believed in the validity of the *Jaffee* ruling. Both the theory of the brief and the timing of the *Collins* case support that view. This court expressly disapproves of the tactics engaged in by the SEC in this matter and feels it appropriate to so state on the record.

**27.** An alternate reading of the *Collins* decision would result in a slightly different formulation of the question: Did the activities of Faulkner constitute in themselves a distribution?

the shares being sold pursuant to Registration Statement No. 2–40398. However, it appears that the SEC in determining whether certain NASD members were acting as underwriters in the White Shield distribution, treated all the shares being sold under two registration statements, Nos. 2–40398 and 2–40397, which covered 1,272,513 shares, as one offering. Faulkner's participation in that distribution amounted to about 3.5% of the total. If all four registration statements are considered, Faulkner's participation drops to 1.04%. Furthermore, Faulkner itself acknowledges that its purchase of the White Shield stock was "for resale in the ordinary course of its business." Faulkner's Memorandum of Law in Support of its Motion for Summary Judgment at 105. Under the *Burns, Nordeman* standard, Faulkner has not made a distribution of White Shield stock nor has it sufficiently participated in a distribution pursuant to *Collins.*

■ Both the SEC and the defendant argue that even if the court holds that the *Jaffee* case is invalid or inapplicable, Section 23(a) of the Securities Exchange Act, 15 U.S.C. § 78w(a), should provide protection to the defendant. Section 23(a) provides that:

> No provision of this chapter imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule or regulation of the Commission . . . notwithstanding that such rule or regulation may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason.

Even accepting the extension of this section articulated in *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281 (2d Cir. 1973) that it applies to the Commission's interpretations of its own Rule, this court cannot agree to a further extension to reach liability imposed by state contract law. Congress has worded this exemption narrowly and there is no indication it should be otherwise construed.

It is therefore concluded that the Fourth Defense is insufficient as a matter of law.

Defendant's motion for summary judgment on its Fourth Affirmative Defense and its Second Counterclaim is denied. Plaintiffs' motion for summary judgment on defendant's Fourth Affirmative Defense and Second and Third Counterclaims is hereby granted.

### FIFTH AFFIRMATIVE DEFENSE

■ The defendant's Fifth Affirmative Defense is unique; Faulkner asserts the right to cancel the contract and rescind the purchase on the receipt of the prospectus. No authority has been cited for this proposition, and this court has been unable to find any. Acceptance of this defense would stretch the provisions of the act far beyond their intended scope.

The defendant argues that inherent in the prospectus delivery requirement is an implied right to rescind. Otherwise, so the argument goes, the purpose of the delivery requirement would be defeated. That reading flies in the face of the statute and ignores already far-reaching, remedial provisions.

Section 5(b)(2)[28] of the 1933 Act makes it unlawful for anyone to send a registered security through the mail "for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus." It was clearly within the contemplation of the drafters of the statute that a purchaser might not see the prospectus covering the security he purchased until after the sale had been completed. Yet no provision of the statute either permits recission upon receipt of the prospectus or prevents the parties from binding themselves to the terms of a contract prior to that receipt.

Furthermore, Section 12 of the 1933 Act[29] explicitly provides for recission in two specific circumstances: where a person offers or sells securities (a) in violation of Section 5 of the Act or (b) through the use of a material misrepresentation. The defendant would have this section judicially

---

**28.** 15 U.S.C. § 77e(b)(2).

**29.** *Id.* § 77l.

amended to include a third situation, *i. e.,* where a person, in conformity with the statute delivers a final prospectus and the purchased securities simultaneously. This the court refuses to do.

In support of its position, the defendant states that without this implied right to rescind, "What function does the prospectus serve? . . . [T]he entire statutory scheme would be incongruous and would fail in its principal purpose." [30] The fallacies in this reasoning should be patently obvious. First, a reading of the defendant's Third Affirmative Defense should help remind it what function the delivery of a prospectus serves even where it is delivered simultaneously with the shares being purchased. Section 12 does not limit the right to rescind to a time prior to the delivery of the purchased shares. In *Diskin v. Lomasney & Co.,* 452 F.2d 871 (2d Cir. 1971) the court granted rescission pursuant to Section 12 even though the purchaser had the opportunity to read the prospectus before paying for the shares, had taken delivery and paid in full for the shares when tendered and had waited nine months before demanding recission. This case makes it clear that there is no requirement that the purchaser exercise whatever right to rescind he claims to have immediately upon reading the prospectus. Thus where the prospectus gives the purchaser notice that a sale has been effectuated through the use of material misstatements or where the purchaser, at a later date, discovers that the prospectus whenever delivered omits a material fact, an action for rescission is available to him.

Also, the statute makes the time when the shares are delivered the last moment when the prospectus must be made available to the purchaser. If a written confirmation is sent earlier, a prospectus must accompany it. § 5(b)(1) of the Securities Act of 1933, 15 U.S.C. § 77e(b)(1). Furthermore, no purchaser is compelled by any provision of the Act to bind himself to the purchase of any stock until he has had the opportunity to examine a final prospectus.

Accordingly, the defendant's motion for summary judgment on its Fifth Affirmative Defense is hereby denied and the plaintiffs' motion with respect to this defense is granted.

## SIXTH AFFIRMATIVE DEFENSE

The defendant has asserted as its Sixth Affirmative Defense the failure of the plaintiffs to retender the shares, demand acceptance of them by Faulkner, or sell them within a reasonable time. These failures by the plaintiffs are said to constitute acquiescence in the cancellation and waiver of any right of recovery.

The court agrees that a party to a contract must tender its performance before he can hold another in default. *Garfield v. Strain,* 320 F.2d 116 (10th Cir. 1963). But there can be no question, and the court so finds, that Brynes and Santangelo have met their burden with respect to demanding performance of the contract. The parties have stipulated that on or about June 15, subsequent to the rejection of the tendered stock by Faulkner, Marc Green, counsel for Faulkner, discussed the cancellation of the trade with Vincent Ross of Tobey & Kirk, and Melville Hicks and Peter Landau, both attorneys for Tobey & Kirk. During one of those conversations, Mr. Landau informed Mr. Green that he would instruct Tobey & Kirk to *redeliver* the stock; Mr. Green responded that the stock would be refused. Stipulation, paragraph 21.

The parties have also stipulated that on or about June 21, 1971 Mr. Green had a conversation with Ray Merritt, an attorney for Brynes. Mr. Green again stated that Faulkner was not obligated to accept the stock and that Faulkner would litigate the issue. Stipulation, paragraph 22. On or about the same date, it has also been stipulated that meetings were held with the two individual plaintiffs, Vincent Ross of Tobey

30. Letter to the court from Jacobs Persinger & Parker, attorneys for Faulkner, dated December 2, 1975, at 4.

& Kirk and several representatives of Faulkner at which Faulkner explained why it had cancelled the trade. Stipulation, paragraph 23. It has been agreed that the last communication between Faulkner and either the plaintiffs or Tobey & Kirk occurred on June 23, 1971 when Mr. Green confirmed to Ross that Faulkner would not accept the stock. Stipulation, paragraph 24.

Under these circumstances there is no question of acquiescence. If any delay occurred after this time, it would relate to the question of the proper measure of damages, if any. It cannot be argued, however, that by failure to sell out immediately after June 23, 1971, the plaintiffs were acknowledging an acceptance of Faulkner's refusal to consummate the transaction. Plaintiff's motion for summary judgment, dismissing Faulkner's Sixth Affirmative Defense, is granted.

## SEVENTH and EIGHTH AFFIRMATIVE DEFENSES

Two of Faulkner's affirmative defenses relate solely to the measure of damages for which it would be liable were the contract upheld and Faulkner found to be in breach. It is not necessary to reach either of these issues in light of the court's decision on the Second Affirmative Defense. However, in light of the extraordinary circumstances of this case, the court believes it to be appropriate to comment briefly on these defenses.

■ The Seventh Affirmative Defense seeks to limit the damages recoverable on the ground that the plaintiffs failed to mitigate their damages. According to Faulkner, the plaintiffs, having failed to resell the stock within a reasonable time are limited to the difference between the contract price and the market price on settlement date. The plaintiffs argue that their conduct was reasonable and that they should therefore recover their full damages—the difference between the contract price and the price at which the shares in question were actually sold. This court finds that the reasonableness of the plaintiffs' conduct

is a question of fact which cannot be determined in a motion for summary judgment.

For its Eighth Affirmative Defense, the defendant invokes Regulation T of the Board of Governors of the Federal Reserve System which regulates the extension of credit between broker dealers and their customers. Faulkner argues that by failing to liquidate its account promptly, Tobey & Kirk violated the Regulation and the damages are consequently limited to the difference between the contract price and the market price five days after settlement date.

■ The purpose of Regulation T was to avoid excessive speculation in the securities market and "to prevent speculation on credit from draining a disproportionate share of the nation's credit resources into the stock market." *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith*, 469 F.2d 1166, 1180 (8th Cir. 1972). In order to effectuate this purpose, the statute prohibits a creditor, statutorily defined as a broker or a dealer, from extending, arranging or maintaining any credit for a customer except as is expressly permitted by its terms. 12 C.F.R. § 220.

The defendant argues that *Naftalin & Co., supra*, stands for the proposition that Faulkner's status as a market maker does not prevent it from being considered a customer and that Tobey and Kirk clearly fits within the definition of creditor. The plaintiffs argue that they, not Tobey and Kirk, were the creditors and that Regulation T does not reach credit extended by private individuals if, in fact, any credit was extended under the circumstances of this case.

■ While the court does not dispute the fact that Tobey and Kirk fits within the definition of creditor and that Faulkner can be considered a customer, that reading of the statute ignores the fact that no violation has occurred unless credit is improperly extended. This is not a case like *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970), *on remand*, 346 F.Supp. 443 (S.D.N.Y. 1972), *reversed on other grounds*, 527 F.2d

1141 (2d Cir., 1975), in which the defendant broker dealer arranged a loan for the plaintiff who wished to purchase securities, bought those securities for the customer and then transferred them to the lending institution when the plaintiff failed to make the requisite payments. In that case the customer owed the purchase price to the broker dealer who failed to conduct the sell out as required by Regulation T. Here it is the plaintiffs to whom Faulkner allegedly owes the purchase price of the shares. If there has been any extension of credit, it was done by the plaintiffs themselves and not by their broker dealer. Accordingly, this court finds no violation of Regulation T.

### NINTH AFFIRMATIVE DEFENSE

The defendant's Ninth Affirmative Defense is based on Tobey & Kirk's alleged failure to follow the NASD Uniform Practice Code in conducting the sell out of the rejected White Shield stock. The court rejects this defense on two grounds.

First, the Uniform Practice Code relates specifically to transactions between members. § 1(a). The plaintiffs who are suing to recover the purchase price of the rejected stock are not bound by the NASD Rules and their rights do not depend on Tobey & Kirk effectuating the transaction in accordance with NASD procedures.

Second, § 1(b) of the Uniform Practice Code provides that "failure to deliver the securities sold, or failure to pay for securities as delivered, on or after the settlement date, does not effect a cancellation of the contract. The remedy for the buyer or seller is provided for by Sections 59 and 60 respectively." The court does not accept the view that where the remedial sections are not followed, the contracts are thereby cancelled. The sections were written specifically to protect the party whose contract has been breached; this court can find no basis for implying a more drastic remedy where the injured party itself has failed to pursue the remedy provided. Furthermore, sections 59 and 60 are permissive and do not require that the injured party pursue the

specific remedy detailed in them. The defendant's motion for summary judgment on its Ninth Affirmative Defense is hereby denied; the plaintiffs' motion to dismiss that defense is granted.

Except with respect to defendant's Second Affirmative Defense, Faulkner's motion for summary judgment on its First Counterclaim is in all other respects denied. Plaintiffs' motion for summary judgment on their claim for declaratory relief and to dismiss defendant's First Affirmative Defense is denied.

SO ORDERED.