## SECURITIES AND EXCHANGE COMMISSION

v.

## SOUTHWEST COAL & ENERGY COMPANY, Paul E. Cash, Jerry W. Heflin and Philip H. Parsons.

Civ. A. No. 76–0723.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Nov. 8, 1977.

David N. Reed, Securities & Exchange Comn., Houston, Tex., for plaintiff.

Earl L. Yeakel, III, Kammerman, Yeakel, Trickey & Overstreet, Austin, Tex., C. B. Harrison, Jr., Harrison & Goodner, Dallas, Tex., for defendants Cash and Heflin.

James A. Burnett, Burnett, Sutton, Walker & Callaway, Shreveport, .La., for defendant Parsons.

## OPINION

STAGG, District Judge.

The Securities and Exchange Commission (SEC) filed a complaint against Southwest

Coal & Energy Company (Southwest), Paul E. Cash (Cash), Jerry W. Heflin (Heflin) and Philip H. Parsons (Parsons) on July 12, 1976. On July 19, 1977, the Court granted partial summary judgment for the SEC and issued a permanent injunction against the individual defendants forbidding future violations of the registration provisions of the Securities Act of 1933 (1933 Act). The Court dismissed the claims against Southwest on July 25, 1977, because the corporation had been dissolved. The same day, Parsons consented to a permanent injunction, which is being filed with this opinion today.

The case came on for trial on the claims by the SEC that Cash and Heflin had violated § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), and Rule 10b–5, 17 C.F.R. 240.10b–5, issued pursuant to § 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78j(b). At the close of the two-day trial on July 26, 1977, the Court took the decision under advisement pending receipt of briefs from all parties.

## FINDINGS OF FACT

1. Cash, Heflin and Parsons incorporated Southwest on August 26, 1974. Each of them owned one-third of the common stock of the corporation, which was organized under the laws of Texas and was qualified to do business in Louisiana. The incorporators organized Southwest to sell undivided interests in oil and gas leases pursuant to Schedule D of Regulation B, issued pursuant to the 1933 Act's small offering exemption.

2. Southwest maintained its principal place of business at 1313 Centenary Drive, Shreveport, Louisiana. Parsons served as President and he supervised the Shreveport office. His responsibilities included hiring, training and supervising a force of salesmen who sold the Southwest interests by long distance telephone solicitation of potential investors, whose names were derived from various sources.

3. Cash and Heflin maintained offices in Dallas, Texas. They acquired various leases and supervised the drilling and completion or abandonment of all of Southwest's wells. They made the decision whether to abandon or complete wells.

4. Cash and Heflin prepared 15 Schedule D offering sheets on behalf of Southwest between October, 1974, and December, 1975. Southwest sold interests in and drilled 12 wells in Palo Pinto and Jack Counties, Texas, during that time period or shortly thereafter. The sales were made to approximately 300 investors through the use of the mails and other means and instrumentalities of interstate commerce and communication. The total amount of sales was approximately $1.8 million.

5. Before and after the formation of Southwest, Cash and Heflin had acquired the controlling interest in or formed several corporations whose businesses were oil and gas related. Cash and Heflin each owned one-third of Oklahoma Coal & Oil Company (Oklahoma), Texas Coal & Energy Company (Texas), Southwest, and LaPrada Oil & Gas Company (LaPrada). Together they owned the majority interest in Southern Banker's Investment Company (SBIC), a holding company with several subsidiaries. SBIC owned J. P. Oil Company, Spindletop Drilling Company, Spindletop Securities, Insiders Investment Fund, Inc., Dallas Stock Exchange, Inc., and Spindletop Oil & Gas Company (Spindletop). Spindletop, in turn, controlled Enntex Oil & Gas Company (Enntex), a Texas corporation, Enntex Oil & Gas Company, a Nevada corporation succeeding Enntex, and Southwest Nuclear Company. The sale and development of oil and gas wells pursuant to a Schedule D exemption was the principal business of most of the companies in the pyramid, including Oklahoma, Texas, Southwest, LaPrada and Enntex.

6. In several instances, Schedule D offerings by the affiliated companies were located on adjacent or neighboring leases. In a number of cases, Enntex, Spindletop or LaPrada acquired leases and assigned them to Southwest. Southwest paid a lease acquisition fee for the assignment.

7. Heflin had been a Schedule D salesman prior to forming Southwest. He first worked for Ascot Oil Company (Ascot). While there he was asked to make untrue representations to potential investors as a part of his sales "pitch". He later moved on to Mark Priddy & Associates (Priddy), another Schedule D operator. While at Ascot and at Priddy, Heflin met several men who later would work for Southwest, including Bruce Barousse, Gayle Dacus, and Parsons.

8. Heflin and Parsons met while both of them were salesmen at Priddy. Parsons had gone to Priddy from World-Wide Oil & Gas Company, another Schedule D company. Parsons and Cash had never met prior to organizing Southwest.

9. Most of the salesmen at Southwest were experienced men from Ascot and Priddy. Charles Riffle, Buddy Dye, Bruce Barousse and Gayle Dacus all had worked at Ascot or Priddy or both. The salesmen used their own client lists and lists of potential investors, which Southwest obtained from various sources, to get sales leads. They then solicited sales by long distance telephone conversations.

10. Once the sales office was advised that a particular Schedule D offering had become effective, the salesmen began to make initial contact, or "P.R." calls. If a lead seemed interested, the salesman would send him a copy of the offering sheet. Several days later the salesman would call back to discuss the geology, location, price and other attributes of the offering in an attempt to "close" the sale. The sale would be completed by the investor, who sent his check for drilling and testing money attached to a "Request for Interest" statement. The request would contain the following language just above the signature line:

"I acknowledge that for a period of forty-eight hours I have been in receipt of and have examined a copy of the offering sheet and the exhibits attached hereto filed with the Securities and Exchange Commission relating to this offering and that I have not relied on any other representations with respect to the offering."

11. The investment involved a two-step collection process. The initial amount sent by the investor covered only the drilling and testing costs. If Southwest, through Cash and Heflin, decided to complete the well, the salesmen would contact the investors to obtain completion funds. All wells were drilled on a turnkey basis.

12. Parsons monitored the salesmen's calls by a special telephone hook-up in his office. He also briefed them on new offerings.

13. The salesmen received commissions of 15 per cent of the drilling and testing money and 5 per cent of the completion money. Cash and Heflin received "merit pay" or a "bonus" whenever an offering was sold or completed. They each received approximately $100,000 between May, 1975, and January, 1976, as compensation for their services. The "bonus" on completion came out of "administrative costs".

14. The testimony of plaintiff's and defendants' witnesses conflicted on the subject of oral representations made to potential investors by Southwest salesmen. Two investors, Charles Hobson and Derold Munger, testified that the salesmen enticed them with statements that particular wells were good prospects, that they were "winners", that an investor in a 1 per cent interest could expect substantial returns within 30 to 90 days of completion, and that the wells had a long production expectancy. None of the statements were true, if they were made. Gayle Dacus, Hobson's salesman, denied making them and Frank Hendricks, Munger's salesman, did not testify. In addition, both Hobson and Munger admitted they signed the "Request for Interest" under the acknowledgment. Charles Riffle testified that he had told potential investors that some wells were "winners". He explained that the statement was a product of his training at Ascot Oil. Cash and Heflin maintained no supervision of the salesmen; rather, they delegated that responsibility to Parsons.

15. Between November 4, 1974, and November 20, 1975, Southwest filed 15 Sched-

ule D offering circulars with the SEC. It withdrew two of the filings and sold the other offerings. Each offering circular contained a warning on the first page:

"THE PERSON FILING THIS OFFERING SHEET HAS NOT INCLUDED ANY ESTIMATION OF THE AMOUNT OF OIL OR GAS RECOVERABLE FROM THE TRACT IN QUESTION. SHOULD ANY PERSON EMPLOY ANY SUCH ESTIMATION OR ANY ESTIMATION OF OIL OR GAS RECOVERABLE FROM ANY OTHER TRACT FOR COMPARATIVE PURPOSES SUCH ESTIMATION SHOULD BE TOTALLY DISREGARDED; AND THE USE OF ANY SUCH ESTIMATION SHOULD BE FORTHWITH REPORTED TO THE SECURITIES AND EXCHANGE COMMISSION, WASHINGTON, D.C."

The SEC approved all of the circulars as to form prior to their effective dates.

16. Maps enclosed with the offering circulars showed the locations of the leases in which interests were purchased and the activity on surrounding fields. The maps showed activity on contiguous tracts by affiliates of Southwest, but the circulars did not disclose that the companies were affiliates of Southwest. In the circulars for the Buzbee, J. L. Pennington, Rose Thacker, Dock Ringo, Earnestine Gillespie, 4C Ranch/Curtis and Wanda Holt leases, the company stated that affiliated companies might acquire adjacent leases and drill on them, but the circulars failed to disclose the names of the affiliates or how they were affiliated. In the circulars for the Smith # 1, Doyle Snow and J. R. Halsell leases, Southwest made no mention of any nearby activity by affiliates and it did not mention the names of any affiliates.

17. The maps, coupled with the omission, would give an investor the impression that several independent companies had investigated the area and had concluded to drill in the area. In fact, in many instances the investigation and conclusion had been completed by the same group of people.

18. The circulars for the Smith # 1, Rose Thacker, Dock Ringo, J. R. Halsell, Earnestine Gillespie, 4C Ranch/Curtis, Wanda Holt, and Buzbee leases indicate that Southwest acquired the leases from Spindletop, Enntex, or LaPrada. They also disclosed that Southwest paid a lease acquisition price for the lease. The circulars for those leases did not disclose the relationship between Southwest and Spindletop, Enntex or LaPrada. This omission created the impression that Southwest had negotiated at arms-length with an independent owner for the leases, when in fact it had acquired the leases from a company owned or controlled by Cash and Heflin.

19. In every offering circular, Southwest listed sales commissions and administrative costs as separate amounts expended from completion costs. Cash and Heflin, who decided whether and when to complete a well, received a "bonus" as part of the completion process. Thus, the circulars did not disclose that the persons who ultimately called for completion money received essentially a commission from the completion funds.

20. On November 20, 1975, the Texas Attorney-General sued Cash, Heflin, Enntex and LaPrada for alleged violations of the Texas Securities Act in connection with Schedule D offerings. On December 18, 1975, the Texas state court issued a temporary restraining order enjoining Cash, Heflin, Enntex, and LaPrada from violating the Texas Securities Act. Although 11 sales covering 15 per cent interests in the Buzbee lease occurred after the restraining order was issued, Southwest did not disclose the litigation or the order to buyers in the circular or in oral representations.

21. From the evidence presented at trial, the Court can find no intent to deceive or to defraud on the part of Cash or Heflin. The evidence was insufficient to link them to the representations of the salesmen, and it did not show any reckless disregard for the truth in delegating supervision of salesmen to Parsons.

22. The evidence did show that Cash and Heflin knew the facts omitted from the

offering circular and that they obtained money by omitting facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. The omitted facts would have influenced the decision of a reasonable investor. Those facts were:

(a) That certain of the activities on tracts adjacent to various leases were conducted by affiliates of Southwest, and the relationship of the affiliates to Southwest;

(b) That certain of the leases were acquired from, and a lease acquisition fee was paid to, affiliates of Southwest;

(c) That the persons who decided whether to complete a well received a commission from the completion money; and

(d) That a temporary restraining order had been issued against two of the three major shareholders of Southwest and two of its affiliates enjoining them from violating the Texas Securities Act.

23. Cash and Heflin were adamant at trial that they had done nothing wrong. They could see no reason to disclose the matters that they omitted to disclose. There was evidence that they intended to issue other oil and gas securities in the future, although they denied it. The Court finds that there is a reasonable likelihood that similar events will occur in the future with respect to Cash and Heflin.

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over the claims of the SEC. It has personal jurisdiction over the parties, and it is a court of proper venue.

■ 2. To be entitled to the injunctive relief it seeks, the SEC must prove (a) that Cash and Heflin violated either Rule 10b–5 issued pursuant to § 10(b) of the 1934 Act, or § 17(a) of the 1933 Act, and (b) that there is a reasonable likelihood that they will commit violations in the future. *See SEC v. Parklane Hosiery Co.*, 558 F.2d 1083 (2d Cir. 1977).

3. The United States Supreme Court unequivocally has held that in a private action for damages under § 10(b) of the 1934 Act

scienter, or "a mental state embracing intent to deceive, manipulate, or defraud", is an essential element of the claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). The Court specifically left open the question whether scienter was an element of a claim for *injunctive* relief under Rule 10b–5. The post-*Hochfelder* decisions have disagreed about the application of scienter to SEC enforcement actions. Two circuit courts have indicated that scienter is not required in an enforcement action. *SEC v. Universal Major Industries Corp.*, 546 F.2d 1044 (2d Cir. 1976) (*dictum*); *SEC v. World Radio Mission, Inc.*, 544 F.2d 535 (1st Cir. 1976). Two district courts have decided that the SEC must prove scienter to be entitled to injunctive relief under Rule 10b–5. *SEC v. American Realty Trust*, 429 F.Supp. 1148 (N.D.Va.1977); *SEC v. Bausch & Lomb, Inc.*, 420 F.Supp. 1226 (S.D.N.Y. 1976). One of those courts, however, held that reckless disregard for the truth constituted scienter. *SEC v. Bausch & Lomb, Inc., supra. See also Sanders v. John Nuveen & Co.*, 554 F.2d 790 (7th Cir. 1977).

■ 4. In *Hochfelder*, the Supreme Court analyzed Rule 10b–5 in terms of the Congressional intent in enacting its enabling statute, § 10(b) of the 1934 Act. The Court ruled that if Rule 10b–5(2) or (3) were interpreted to include negligent or innocent conduct, it would be beyond the authority of § 10(b), which, according to the Court, envisioned some degree of moral turpitude, perhaps including recklessness. The SEC is bound by the limits of § 10(b) as much as a private plaintiff; thus, the better analysis of *Hochfelder* leads to the conclusion that scienter is an element of any claim based on Rule 10b–5 and § 10(b) of the 1934 Act. *SEC v. American Realty Trust*, 429 F.Supp. 1148 (N.D.Va.1977).

■ 5. In this case, the evidence was insufficient for the Court to find an intent to defraud or deceive or a reckless disregard for the truth. The SEC therefore has not met its burden to show entitlement to an injunction against future violations of § 10(b) and Rule 10b–5.

6. Section 17(a) of the 1933 Act contains language very similar to that of Rule 10b–5(2). This similarity has led one district court to conclude that scienter is an element of a § 17(a) claim based on *Hochfelder's* holding with respect to Rule 10b–5. *SEC v. American Realty Trust*, 429 F.Supp. 1148 (N.D.Va.1977). The United States Court of Appeals for the First Circuit disagrees. *SEC v. World Radio Mission, Inc.*, 544 F.2d 535, 1541 n. 10 (1st Cir. 1976). As the rationale of *Hochfelder* appears not to require such a broad reading, this Court must agree with the view of the First Circuit.

▪ 7. While the 1933 Act and the 1934 Act generally should be considered *in pari materia*, in *Hochfelder* the Supreme Court admonished lower courts to examine each section of the Acts to determine the appropriate standard of fault:

"It is thus evident that Congress fashioned standards of fault in the express civil remedies in the 1933 and 1934 Acts on a particularized basis. Ascertainment of congressional intent with respect to the standard of liability created by a particular section of the Acts must therefore rest primarily on the language of *that section*." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976) (emphasis added).

The standard of care under § 17(a) must be determined by reference to § 17(a), not to § 10(b) of the 1934 Act.

▪ 8. Section 17(a)(2) makes it unlawful for any person, in the offer or sale of a security in interstate commerce, to obtain money or property "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading . . . ." The subsection immediately preceding it prohibits the employment of devices or schemes to defraud. If intent to defraud were required in § 17(a)(2), then every act covered by it would also be covered by § 17(a)(1), rendering § 17(a)(2) meaningless. In interpreting a statute, a court should avoid an interpretation that renders a clause meaningless. Thus, Congress must have intended not to require proof of scienter to establish a claim under § 17(a)(2) of the 1933 Act.

9. Part of the discussion in *Hochfelder* lends credence to the conclusion that scienter is not essential to a § 17(a)(2) claim. In illustrating the approach to determining the standard of culpability, the Supreme Court noted that § 11 of the 1933 Act creates a private action for damages when a registration statement contains material misstatements or omissions. It noted that the statute makes the issuer absolutely liable, without culpability, while some defendants may assert a "due diligence" defense, reducing the standard to negligence. The language of § 17(a)(2) is nearly identical to that of the operative portion of § 11. Thus, the rationale of *Hochfelder* impels the conclusion that § 17(a)(2) creates a claim for injunctive relief by the SEC without any showing of scienter.

▪ 10. Moreover, while there is much similarity between Rule 10b–5(2) and § 17(a)(2), there is an important distinction between the rule and the section. As an administrative regulation, the rule can be only as broad as the enabling statute, § 10(b) of the 1934 Act, allows. *Hochfelder* holds that the enabling statute does not encompass negligent or innocent behavior. Section 17(a), on the other hand, is self-enabling. It need not rest on a delegating statute; thus, it need not be limited as *Hochfelder* has limited Rule 10b–5. *SEC v. World Radio Mission, Inc.*, 544 F.2d 535, 541 n. 10 (1st Cir. 1976).

▪ 11. Finally, in interpreting § 17(a) of the 1933 Act and § 10(b) of the 1934 Act, the Court recalls the general purposes underlying the passage of both Acts. The 1933 Act primarily was intended to promote disclosure in securities transactions, while the 1934 Act was largely an antifraud measure. It is entirely consistent that motive is an essential component of a claim under § 10(b) of the 1934 Act while state of mind is irrelevant under § 17(a)(2) of the 1933 Act.

12. Scienter is not required to prove a claim under § 17(a)(2) of the 1933 Act. To be entitled to an injunction, the SEC need only prove that a person, in an offer or sale of a security by means of interstate commerce or the mails, obtained money or property by means of a material misstatement or omission, and that there is a reasonable likelihood of future violations. A misstatement or an omission is material if a reasonable investor would have considered it important in making his decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Wheat v. Hall*, 535 F.2d 874 (5th Cir. 1976); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975).

13. In the instant case, Cash and Heflin obtained money in the offer and sale of securities in interstate commerce. They omitted facts from the offering circulars that a reasonable investor would have considered important to his investment decision, namely, the affiliation of neighboring leaseholders, the affiliation of assignors of leases, the commission on completion to the persons deciding whether to complete the well, and the possibility of securities violations as indicated by the temporary restraining order. All of these facts would have affected the investors' evaluation of the value of the interest, the risk of investment and the trustworthiness of the offeror. In addition, the Court found a reasonable likelihood of similar conduct in the future.

14. SEC has established that Cash and Heflin violated § 17(a)(2) of the 1933 Act and that there is a reasonable likelihood that they will violate it again in the future. It therefore is entitled to an injunction restraining them from committing any future violations.

## JUDGMENT

The case having come on for trial before the Court, Honorable Tom Stagg, District Judge, presiding, and the issues having duly been tried and a decision having duly been rendered,

IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff Securities and Exchange Commission and against defendants Paul E. Cash and Jerry W. Heflin on the claim based upon § 17(a) of the Securities Act of 1933, and that there be judgment in favor of defendants Paul E. Cash and Jerry W. Heflin and against plaintiff Securities and Exchange Commission, dismissing the claim based upon § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Paul E. Cash and Jerry W. Heflin, and anyone acting under their control, directly or indirectly, hereby are enjoined from, in the offer or sale of fractional undivided working interests in oil and gas leases, or any other securities, by the use of the mails or any means or instruments of transportation or communication in interstate commerce, making untrue statements of material facts or omitting to state material facts necessary to be stated in order to make the statements made, in light of the circumstances in which they were made, not misleading. More specifically, they shall not engage in misstatements or omissions of material fact regarding, but not limited to:

(1) The relationship of their own company to other companies drilling oil or gas wells on adjacent or nearby tracts of land;

(2) The relationship of their own company to any other company from which it acquired a lease for compensation;

(3) Any commission or "bonus" on completion money received by the person or persons who decide whether to complete a particular well; and

(4) The existence of any orders or injunctions against them or any company that is affiliated or controlled by them, involving violations of state or federal securities laws.