624 F.2d 1312
 Fed. Sec. L. Rep. P 97,620
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee Cross-Appellant,
v.
SOUTHWEST COAL & ENERGY COMPANY, Defendant.
Paul E. Cash and Jerry Heflin, Defendants-Appellants Cross-Appellees.
 No. 78-1130.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 28, 1980.
 
 Earl L. Yeakel, III, Austin, Tex., C. B. Harrison, Jr., Dallas, Tex., for defendants-appellants cross-appellees.
 James H. Schropp, Washington, D. C., David N. Reed, Houston, Tex., Paul Gonson, Theodore S. Bloch, Washington, D. C., for SEC.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before COLEMAN, Chief Judge, REAVLEY and HATCHETT, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 The Securities and Exchange Commission ("SEC") brought this injunctive action against Southwest Coal & Energy Company and its owners and directors, Paul E. Cash, Jerry W. Heflin, and Philip H. Parsons, alleging that they had violated the registration and antifraud provisions, §§ 5(a), (c) and 17(a), of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), (c) and 77q(a), and the antifraud provision, § 10(b), of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Prior to trial, Parsons accepted a consent judgment, and the district court dismissed as moot the case against Southwest Coal, following that corporation's dissolution. On July 19, 1977 the court entered a partial summary judgment in favor of the SEC on the § 5(a), (c) registration violation question and, accordingly, granted a permanent injunction against further violations of that section by Cash and Heflin. Finally, after a trial to the bench, the court on November 9, 1977 found that Cash and Heflin had contravened one of the antifraud provisions, § 17(a)(2) of the 1933 Act, and permanently enjoined them from committing any further violations. 439 F.Supp. 820, 826-27 (W.D.La.1977). The court held, however, that the SEC had failed to prove that Cash and Heflin had acted with the scienter requisite to violations of § 17(a) (1) of the 1933 Act, § 10(b) of the 1934 Act and rule 10b-5, and, therefore, declined to enter an injunction relating to future violations of these provisions. Each party appeals that aspect of the decision adverse to him. We affirm the judgment of the district court with respect to its disposition of the fraud issues under §§ 17(a) and 10(b) and rule 10b-5, but reverse the judgment on the alleged § 5 registration violation.
 
 I. BACKGROUND
 
 2
 Southwest Coal & Energy Company, a Texas corporation, was formed by Cash, Heflin and Parsons on August 26, 1974 for the purpose of selling undivided interests in oil and gas leases pursuant to Schedule D of the exemption from the registration requirements of the Securities Act of 1933 provided in Regulation B, 17 C.F.R. §§ 230.300-.346 (1979). See 15 U.S.C. § 77c(b) (statute under which regulation was promulgated). Each man owned one-third of the common stock of Southwest and served as a director. Parsons acted as its president, maintaining the company's principal place of business in Shreveport, Louisiana, and overseeing its day-to-day sales operations. Cash and Heflin maintained offices in Dallas, Texas, from which they acquired leases and supervised the drilling and completion of all of Southwest's wells. They also were responsible for preparing the Schedule D offering sheets, 17 C.F.R. § 230.326 (1979), under which the interests were marketed. Between November 4, 1974 and November 20, 1975, Southwest filed 15 such offerings with the SEC, though it withdrew two and sold only 13.
 
 
 3
 In addition to their interests in Southwest, Cash and Heflin, either directly or through a holding company, together controlled several other oil and gas drilling companies whose principal business similarly included the sale of Schedule D securities. In numerous instances, these affiliated companies held leases adjacent to Southwest's. Maps accompanying Southwest's offering sheets depicted these leases and wells surrounding the Southwest lease in which interests were being offered, but did not disclose that these adjoining leases belonged to affiliated companies. Moreover, Southwest occasionally acquired leases from these commonly controlled enterprises, and, while the offering sheets relating to such leases indicated that they had been purchased from other drilling companies, the offering sheets did not disclose that the sellers were also Cash and Heflin companies. The offering sheets also did not indicate that Cash and Heflin, who made the decision whether to "complete" any given well, received what was essentially a commission from the money solicited from investors for well completion once that determination had been made.
 
 
 4
 It was on the basis of these material omissions that the district court subsequently based its finding that Cash and Heflin had violated one of the antifraud provisions, § 17(a)(2) of the Securities Act of 1933. The court reasoned, for example, that the illustration of the other companies' leases and wells adjacent to those in which Southwest was marketing interests, without the disclosure that these companies were affiliated with Southwest, could mislead an investor to believe that several independent companies had investigated the area and decided to drill there. 439 F.Supp. at 824.
 
 
 5
 On November 25, 1975 the State of Texas brought suit in two state courts against Cash, Heflin and a number of their companies not including Southwest for alleged violations of the registration and brokers' licensing provisions of the Texas Securities Act, Tex.Rev.Civ.Stat.Ann. arts. 581-7(A)(1), 581-12 (Vernon 1964 & Supp.1980). Temporary restraining orders precluding further improper sales of securities, dated that same day, were entered against all defendants and, after the actions were consolidated and a hearing held, a similar temporary injunction issued on December 18, 1975. Southwest, nonetheless, continued to sell a few Schedule D interests, but did not disclose to investors the existence of the injunction or the litigation. Finally on January 20, 1976, due to the injunctions entered against two of Southwest's directors and controlling shareholders and several affiliate corporations, the SEC formally suspended all Regulation B exemptions under which Southwest had been marketing its interests, and all sales ceased.
 
 II. REGISTRATION VIOLATION
 
 6
 A. "Unavailability" of Regulation B Exemption
 
 
 7
 The district court based its summary judgment determination that § 5(a), (c)[1] had been violated on the notion that, since the entry of the injunction against Southwest's directors and affiliates had rendered the Regulation B exemption "unavailable" to Southwest under 17 C.F.R. § 230.306(a)(2) (1979),[2] the exemptions under which it had been operating were automatically rendered ineffective upon the issuance of that injunction.[3] Consequently, those few sales executed after the entry of the injunction were held to have been without benefit of exemption (or, of course, registration) and, therefore, to have been in violation of § 5(a), (c).
 
 
 8
 There is no dispute that the issuance of the injunction here made the Regulation B exemption "unavailable" to Southwest pursuant to § 230.306(a) (2). All parties further acknowledge that this made Southwest ineligible to qualify for a Regulation B exemption for any subsequent offering[4] and that it furnished adequate grounds for the January 20, 1976 formal suspension of the exemptions covering all of Southwest's existing offerings. 17 C.F.R. § 230.334(a)(1) (1979).[5] See Tabby's International, Inc. v. SEC, 479 F.2d 1080 (5th Cir. 1973) (post-filing occurrence of contingency making exemption unavailable is ground for suspension of exemption under analogous provisions of Regulation A, 17 C.F.R. §§ 230.251-.263 (1979)); 3 L. Loss, Securities Regulation 626 (2d ed. 1961). Cash and Heflin part company with the SEC and the district court, however, as to the independent effect of "unavailability" on exemptions previously secured for Southwest's outstanding offerings.
 
 
 9
 Cash and Heflin contend that when an exemption is secured for a particular qualified offering of securities by the filing of the requisite materials with the SEC[6] and a post-filing event viz., the issuance of the injunction here transpires that admittedly would have precluded the offeror from qualifying his offering for the exemption had the event occurred before the filing or use of the Regulation B materials, this occurrence does not automatically render ineffective the exemption previously secured for the offering then outstanding. The occurrence or contingency only furnishes a ground for formal suspension of these outstanding exemptions. The criteria for "availability" and "unavailability," Cash and Heflin argue aside from the express adoption in § 230.334(a)(1) of "unavailability" as a ground for formal suspension pertain only to the eligibility of an offeror to qualify a given offering for the exemption at the outset. "Availability" does not relate to the continued vitality of an exemption once secured; this is relegated solely to the formal suspension mechanism. We agree and, therefore, reject the district court's ruling on this point.[7]
 
 
 10
 That the "availability" or "unavailability" of an exemption under § 230.306(a) relates only to the threshold eligibility of an offeror to obtain an exemption for a new offering is demonstrated by the language of the pertinent provisions and the overall structure of Regulation B. First, § 230.306(a)(1)-(6), which delineates the various situations in which an exemption will not be available, speaks only to disqualifying events that occur within specific periods "prior to the filing or use of such offering sheet." (Emphasis added). Similarly, § 230.306(c) further provides that even if one of these disqualifying contingencies has occurred, the offering may still proceed if the offeror can demonstrate that it is not necessary in the public interest and for the protection of investors "that the exemption be denied" for this offering. The language of these provisions thus focuses solely on the period prior to the attainment of an exemption for a given offering and the commencement of the offering thereunder.
 
 
 11
 More importantly, the SEC interpretation of "availability," adopted by the district court i. e., that the post-filing occurrence of one of the disqualifying contingencies enumerated in § 230.306(a) automatically dissolves all extant exemptions for outstanding offerings in addition to barring qualification for new ones is inconsistent with the overall structure of Regulation B. In addition to their role in establishing threshold eligibility for new Regulation B exemptions, the concept of "unavailability" and its criteria are expressly incorporated into § 230.334(a)(1) as grounds for the formal suspension of outstanding exemptions. To infer, additionally, from the post-filing occurrence of one of those contingencies for "unavailability" the automatic revocation of all extant exemptions would circumvent and render essentially superfluous this formal suspension mechanism expressly provided for such contingencies certainly not the intention of the drafters.[8] Moreover, such a result would directly conflict with the implication of § 230.338(a), which provides that when a suspension order is entered, an offering sheet that has become "effective shall no longer be effective . . .." This section plainly contemplates the active divesting of an exemption by the suspension order itself, rather than the mere confirmation of an earlier, automatic dissolution of the exemption.
 
 
 12
 In the analogous context of the Regulation A exemption, the SEC recently presented essentially this same automatic suspension argument to the Ninth Circuit in SEC v. Blazon Corp., 609 F.2d 960, 968-69 (9th Cir. 1979). There, as here, the regulatory scheme expressly provided for the invocation of a formal suspension procedure upon the same ground argued by the SEC as a basis for automatic dissolution of the exemption. 17 C.F.R. § 230.261(a)(2) (1979). Recognizing, as have we, that the SEC interpretation would circumvent and render superfluous this formal procedure, the Ninth Circuit rejected this approach and held that an exemption, once acquired, continues until formally suspended by the SEC pursuant to the prescribed formal procedure. 609 F.2d at 969.
 
 
 13
 Accordingly, we hold that a post-filing occurrence that would have rendered the Regulation B exemption unavailable to an offeror for any subsequent offerings does not, aside from its use as grounds for formal suspension proceedings, result in the dissolution of previously acquired exemptions under which the offeror is conducting outstanding offerings.[9] Accord, 3 L. Loss, supra, at 628. Consequently, Southwest's sales of securities from outstanding offerings in the interim between the issuance of the injunction and the formal suspension of all Southwest exemptions were made under a still viable Regulation B exemption and, therefore, were not in violation of § 5(a), (c).
 
 
 14
 B. Fraud in Offering Sheet as Voiding Exemption Ab Initio
 
 
 15
 Our rejection of the automatic suspension theory upon which the district court predicated its holding does not end our inquiry into Southwest's alleged transgression of § 5(a), (c), however. This court has discretion to affirm the summary judgment under a different legal theory if that theory finds support in the record, and we would not wrongfully deny one party's right to trial or due process by so doing. Davis v. Liberty Mutual Insurance Co., 525 F.2d 1204, 1207-08 (5th Cir. 1976). See Dandridge v. Williams, 397 U.S. 471, 475 n.6, 90 S.Ct. 1153, 1156 n.6, 25 L.Ed.2d 491 (1970).
 
 
 16
 As an alternative ground in support of its motion for summary judgment below on the alleged § 5 violations, the SEC asserted that Southwest actually had never properly qualified for the Regulation B exemptions upon which it relied since its Schedule D offering sheets were all misleading due to the failure of Cash and Heflin to disclose significant facts in those documents. Such materially defective offering sheets, the SEC reasoned, did not satisfy the initial filing requirements of Regulation B, 17 C.F.R. §§ 230.310, .326, .330(a) (1979). Since, as indicated above, the district court did eventually find after trial that there were such material omissions from these offering sheets, the SEC now contends that the summary judgment, holding the appellants to have violated § 5(a), (c) may be upheld on this alternative theory.
 
 
 17
 The SEC relies for support for its theory primarily upon an analogy to the rule announced in SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1098-1100 (2d Cir. 1972). There the Second Circuit inferred a mandate of truthfulness in the prospectus content requirements of § 10(a) of the 1933 Act, 15 U.S.C. § 77j(a), and held that a prospectus, which became misleading due to the issuer's failure to amend it to reflect material post-registration changes of circumstances, would not satisfy § 10(a). Therefore, sales pursuant to such a prospectus were held to have violated § 5 of the 1933 Act in addition to creating potential liability under the antifraud provisions. Accord, e. g., A. J. White & Co. v. SEC, 556 F.2d 619, 622 (1st Cir.) cert. denied, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977) (following Manor Nursing without analysis of principle); SEC v. Wills, 472 F.Supp. 1250, 1256 n.2 (D.D.C.1978) (dictum); Jefferies & Co. v. Arkus-Duntov, 357 F.Supp. 1206, 1214-15 (S.D.N.Y.1973). Similarly, the SEC contends, an untruthful or misleading offering sheet cannot fulfill the Regulation B filing requirements of §§ 230.310 and .326; therefore, any exemption purportedly secured upon such an offering sheet is void, and sales executed in reliance on it will have been without benefit of registration or exemption and, thus, in violation of § 5(a), (c).
 
 
 18
 There is some superficial logical appeal to the SEC thesis, as distilled from Manor Nursing. However, as was the case with its theory of automatic suspension of exemptions, we do not believe the SEC theory comports with the overall framework of Regulation B or the securities laws as a whole.
 
 
 19
 The federal securities laws were enacted primarily to serve two distinct goals: 1) to promote or require sufficient disclosure of information to allow those in securities markets to make intelligent investment decisions, and 2) to control fraud and manipulation in the trading of securities. Accord, Comment, Truth Up to the Date of Use as a Requirement for a Section 10(a) Prospectus: The Implications of SEC v. Manor Nursing Centers, Inc., 24 Case W.Res.L.Rev. 771, 776-77 (1973); 71 Mich.L.Rev. 591, 594-96 (1973). Essentially discrete statutory mechanisms and provisions were designed to effectuate each of these goals. For example, §§ 5-8, 10 and 12(1) of the 1933 Act, 15 U.S.C. §§ 77e-77h, 77j and 77l (1), relate the standards for disclosure or registration and sanctions and remedies for failure to follow these dictates, while §§ 11, 12(2) and 17, 15 U.S.C. §§ 77k, 77l (2) and 77q, prescribe standards, sanctions and remedies for fraud.
 
 
 20
 The Manor Nursing thesis of fraud as a basis for § 5 violations has been roundly criticized by commentators[10] we believe rightly so for it ignores this dichotomy, intertwines these distinct concepts, and in so doing, derails the statutory balance and mechanisms specifically designed to serve each of these discrete goals. For example, § 12(1) provides strict liability for one who offers or sells a security in violation of § 5. Sections 11 and 12(2) similarly provide liability for offers or sales of securities upon misrepresentation or misleading nondisclosure of material facts, but only if the offeror cannot demonstrate that he did not know, and could not reasonably have been expected to know, of the untruth or omission. Under the Manor Nursing construct, however, one who proves a misrepresentation actionable under § 11 or § 12(2) has also proved a violation of § 5, thus automatically establishing liability per se under § 12(1). Not only does this interpretation render §§ 11 and 12(2) essentially superfluous as remedial mechanisms, but it also obliterates the due diligence defense contained in these sections, plainly intended to be available to defendants in actions under the 1933 Act based on such misrepresentations or nondisclosures. Such a result could not possibly have been intended by the drafters of these provisions. See Byrnes v. Faulkner, Dawkins & Sullivan, 413 F.Supp. 453, 465-66 (S.D.N.Y.1976), aff'd on other grounds, 550 F.2d 1303 (2d Cir. 1977).
 
 
 21
 Since Regulation B merely erects alternative disclosure requirements to the statutory registration procedure, while retaining the statutory sanctions for fraud and for failure to meet these alternative disclosure or registration requirements, the theory urged here by the SEC that sales pursuant to a misleading Schedule D offering sheet cannot, by definition, have been made under a validly obtained Regulation B exemption is susceptible to the same criticism as the Manor Nursing decision from which it derives. That an offering sheet which formally complies with the disclosure requirements of Schedule D is misleading in some respect, should not automatically render void ab initio a Regulation B exemption obtained on the basis of that offering sheet.[11] 3 L. Loss, supra, at 628-29. Rather, as in the Manor Nursing situation, these misrepresentations and material nondisclosures may be adequately dealt with under the pertinent antifraud provisions expressly designed for that purpose, see part III of this opinion infra, instead of under § 5(a), (c), which is more appropriately focused upon failures to adhere to the prescribed formal mechanisms or procedures for disclosure, offers, and sales.[12] We, therefore, reject the SEC's alternative theory in support of the district court's determination that Cash and Heflin violated § 5, and reverse the summary judgment on that point.
 
 III. ANTIFRAUD VIOLATIONS
 
 22
 As indicated above, the district court found that Southwest's Schedule D offering sheets, prepared by Cash and Heflin, were marked by material nondisclosures. Although Cash and Heflin conceded knowledge of the omitted facts, the district court explicitly found that the SEC had not proved the nondisclosures to have been the fruit of "an intent to defraud or deceive or a reckless disregard for the truth" on their part.[13] 439 F.Supp. at 824-25.
 
 
 23
 In attempting to apply the law to these findings of fact, the court reasoned that proof of scienter (an intent to deceive, defraud or manipulate) recently held to be a requisite element of private damages claims under § 10(b) and rule 10b-5, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12, 96 S.Ct. 1375, 1381 & n.12, 47 L.Ed.2d 668 (1976), was also required in SEC injunctive actions under these provisions. Moreover, due to the congruity of the language of § 17(a)(1)[14] with that of § 10(b)[15] and rule 10b-5(a),[16] the court concluded that proof of scienter should similarly be required under § 17(a) (1). Consequently, since in its view the SEC had failed to prove scienter, the district court found no violation of these provisions. On the other hand, the court reasoned that the language of § 17(a)(2) focused only on the effects of misrepresentations or nondisclosures and not on the state of mind of the defendant in making them, and therefore that it did not require proof of scienter. Accordingly, the court found that Cash and Heflin had run afoul of § 17(a)(2) simply on the basis of their material nondisclosures and entered an appropriate injunction upon that determination.
 
 
 24
 The SEC has attacked the district court judgment, contending that, unlike the situation in private damages actions, proof of scienter should not be required for prophylactic SEC injunctive actions based on §§ 17(a)(1), 10(b) or rule 10b-5. Conversely, Cash and Heflin have argued that scienter is also an element of a § 17(a)(2) claim and that the district court therefore erred in finding any fraud violation at all.
 
 
 25
 Although this court in Steadman v. SEC, 603 F.2d 1126, 1131-33 (5th Cir. 1979), cert. granted, --- U.S. ----, 100 S.Ct. 1849, 64 L.Ed.2d 271 (1980) and SEC v. Blatt, 583 F.2d 1325, 1333 (5th Cir. 1978), had recently confirmed the district court's interpretation, we delayed decision in this case to await the Supreme Court's resolution of these issues in Aaron v. SEC, 444 U.S. 914, 100 S.Ct. 227, 62 L.Ed.2d 168, granting cert. to 605 F.2d 612 (2d Cir. 1979). The Supreme Court's recent decision in Aaron completely and finally confirmed the prescient interpretation of the district court here as to the scienter requirements in SEC injunctive and enforcement actions based on the various antifraud provisions of the 1933 and 1934 Acts. --- U.S. ----, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Accordingly, we reject the challenges of both parties on these points.
 
 
 26
 The SEC argues finally, however, that adequate evidence of Cash's and Heflin's reckless disregard for the truth was adduced to prove scienter.[17] See Ernst & Ernst v. Hochfelder, 425 U.S. at 193 n.12, 96 S.Ct. at 1381 n.12 (suggesting reckless disregard for truth may suffice as scienter in some circumstances); First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977), cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978) (noting recklessness as adequate for scienter). The district court's express finding that the requisite intent or recklessness was not proved is, however, reviewable here only for clear error, and the SEC has not raised sufficient question to clear so substantial a hurdle.
 
 
 27
 Accordingly, for the reasons articulated above, the judgment of the district court with respect to Cash's and Heflin's violation of the various antifraud provisions is affirmed; the judgment holding Cash and Heflin to have contravened § 5(a), (c), however, is reversed.
 
 
 28
 AFFIRMED in part and REVERSED in part.
 
 
 
 [1]
 Section 5(a), (c) of the Securities Act of 1933, 15 U.S.C. § 77e(a), (c), provides:
 (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly
 (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
 (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
 (c) it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section (8).
 
 
 [2]
 17 C.F.R. § 230.306(a)(2) (1979), provides:
 (a) No exemption shall be available under this regulation to any offeror if such offeror or any officer, director, predecessor, or affiliate of such offeror as a result of any civil, criminal, or governmental or self-regulatory administrative proceeding, or examination commenced after January 1, 1973:
 (2) Is subject to any order, judgment or decree of any court of competent jurisdiction entered within 5 years prior to the filing or use of an offering sheet, temporarily or permanently restraining or enjoining such offeror from engaging in or continuing any conduct or practice in connection with the purchase or sale of any security, or arising out of such person's conduct as an underwriter, broker, dealer, or investment advisor.
 
 
 [3]
 The district court held the Regulation B exemption to have become unavailable upon the entry of the temporary injunction on December 18, 1975. Even though it appears that the earlier issuance of the temporary restraining orders, dated November 20, 1975, Pltf. exh. 25 & 26, should also have triggered § 230.306(a)(2), in this opinion we shall for the sake of convenience adopt the district court's focus on the injunction, since this discrepancy in dates is essentially irrelevant to the issue on appeal
 
 
 [4]
 In fact, on November 20, 1975 the date of the temporary restraining orders Southwest apparently had submitted a Schedule D offering sheet for a new offering pursuant to Regulation B. Because of the Texas State Court injunction, however, the SEC requested that this application be withdrawn, and this request was complied with on December 1, 1975
 
 
 [5]
 17 C.F.R. § 230.334(a)(1) (1979), provides:
 (a) The Commission may, at any time after the filing of an offering sheet, enter an order temporarily suspending the exemption if it has reason to believe that:
 (1) No exemption is available under Regulation B (§§ 230.300-230.346) for the securities purported to be offered hereunder, or any of the terms or conditions of this Regulation B have not been complied with, including failure to file any reports.
 
 
 [6]
 The Regulation B exemption, promulgated pursuant to § 3(b) of the Securities Act of 1933, 15 U.S.C. § 77c(b), is available for offerings of certain fractional undivided interests in oil and gas rights up to an aggregate amount of $250,000 per offering. The principal prerequisite to obtaining an exemption is the filing of an "offering sheet" of the form and content prescribed by Schedule A, B, C, or D, 17 C.F.R. § 230.326(a) (1979), whichever is appropriate to the particular type of interest to be offered. Generally, a properly submitted offering sheet becomes "effective" and the offering may commence on the eleventh day after the filing. 17 C.F.R. § 230.310(a) (1979)
 
 
 [7]
 We recognize that the burden of proving the applicability of an exemption from registration is on the party claiming it. Pharo v. Smith, 621 F.2d 656, 665 n.3 (5th Cir. 1980). There is, however, no dispute that Southwest had previously qualified for the purported exemption under which it continued sales of securities after the issuance of the injunction. The only issue here is the legal effect of the post-filing injunction on that exemption
 
 
 [8]
 Compare 17 C.F.R. § 230.320 (1979) which does automatically remove the cloak of the Regulation B exemption from offers and sales made in connection with improper estimations of the amount of oil and gas recoverable from the tract in question. In contrast to the provisions and contingencies involved here, § 230.320 explicitly adverts to post-filing occurrences, and the basis for its automatic sanction is not also made a ground for formal suspension of the exemption under § 230.334
 
 
 [9]
 In so holding we do not suggest that where a § 230.306(a) disqualifying contingency has occurred prior to filing, the SEC in its suspension proceedings may not recognize this fact and declare the exemption void ab initio for the particular offering in question. In such a situation, unlike that here, the offeror will never have rightfully qualified for the exemption and though the SEC may not discover this for some time no exemption will ever have actually existed. Consequently, all sales in reliance on such an abortive attempt at exemption will from the outset have been potentially in violation of § 5(a), (c)
 
 
 [10]
 See, e. g., 2 A. Bromberg & L. Lowenfels, Securities Fraud and Commodities Fraud § 6.11 (321) (1979); Comment, supra ; 71 Mich.L.Rev. 591 (1973)
 
 
 [11]
 It might be that if an offering sheet were so incomplete or so permeated with misrepresentations that it was functionally equivalent to filing no offering sheet at all, the filing requirements of Regulation B would not be met, and sales pursuant to such an offering sheet would then contravene § 5(a), (c). Indeed, one district court has stated that this is the proper scope and interpretation of the rule in Manor Nursing. Byrnes v. Faulkner, Dawkins & Sullivan, 413 F.Supp. at 466. We are not faced with that situation here, however
 
 
 [12]
 We do not intend by our holding here to intimate any view as to the viability of the SEC thesis in an analogous context under the Regulation A exemption. That a misleading offering circular may never be used is explicitly raised as a condition of that exemption. 17 C.F.R. § 230.256(e) (1979). See SEC v. Cooper, 402 F.Supp. 516, 524 (S.D.N.Y.1975). No analogous provision appears in Regulation B. Cf. 17 C.F.R. § 230.330(a) (1979) (closest Regulation B approximation of § 230.256(e), merely provides that offering sheets shall constitute continuing representations to investors who rely on them that their contents are "substantially correct and that no material fact has been omitted")
 
 
 [13]
 The SEC also alleged grosser affirmative misrepresentations by Southwest's salesmen. Without resolving the conflicting testimony on this point, the district court held that Cash and Heflin were not responsible for these misrepresentations, if they occurred, since they had delegated actual supervision of the sales crew to Parsons. 439 F.Supp. at 823-24. Moreover, the court found no reckless disregard for the truth in this delegation of supervision. Id. at 824. These conclusions are not clearly erroneous
 
 
 [14]
 Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), provides:
 (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly
 (1) to employ any device, scheme, or artifice to defraud, or
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
 
 
 [15]
 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 [16]
 Rule 10b-5, 17 C.F.R. § 240.10b-5 (1979), provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) to employ any device, scheme, or artifice to defraud,
 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 The degree of recklessness in one's disregard for the truth necessary to serve as scienter is extremely high. The generally accepted formulation of this standard of recklessness was articulated in Franke v. Midwestern Okla. Devel. Auth., 428 F.Supp. 719, 725 (W.D.Okl.1976):
 (R)eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even unexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.
 Accord, e. g. McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979) (quoting Franke standard); Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1025 (6th Cir. 1979) (same); Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir.) cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977) (same). Cash's and Heflin's mere knowledge of the omitted facts would not suffice as scienter under this formulation. Rather, the "danger of misleading buyers" from these known omissions must have been actually known or so obvious that Cash and Heflin "must have been aware of it." Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d at 1045. See also Hirsch v. duPont, 553 F.2d 750, 759 (2d Cir. 1977) ("knowledge of the fraud, and not merely of the undisclosed facts, is indispensable" to proving aiding and abetting securities fraud by nondisclosure).