# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

––––––

No. 10-30859

––––––

EDWARD MILLER,

Plaintiff-Appellant

v.

NATIONWIDE LIFE INSURANCE COMPANY,

Defendant-Appellee

––––––

Appeal from the United States District
for the Eastern District of Louisiana
(06-CV-2334)

––––––

Before SMITH, SOUTHWICK and GRAVES, Circuit Judges.

PER CURIAM:[*]

The Plaintiff-Appellant Edward Miller (Miller) appeals a summary judgment on his breach of contract claims and securities law violation claim against the Defendant-Appellee Nationwide Life Insurance Company (Nationwide). We affirm.

––––––

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-30859

## Facts and Proceedings

This case is brought up on appeal after the District Court for the Eastern District of Louisiana granted Nationwide's summary judgment motion.[1] On May 10, 2010, the district court granted summary judgment to Nationwide on Miller's breach of contract claims; however, it did not dispose of the remaining securities violation claim due to lack of information. Subsequently, Nationwide filed a supplemental memorandum of law in support of its motion for summary judgment on the remaining claim and on August 9, 2010, the district court granted summary judgment.

Nationwide is a life insurance company and is a provider of variable annuity contracts.[2] Miller purchased two contracts in June and July, 2001 for a total amount of a little more than $1.4 million dollars.[3] It provided Miller with its May 1, 2001, prospectus before Miller purchased the annuity contracts

---

[1] For several years now Miller has been attempting to assert his contract rights against Nationwide. His first suit against Nationwide was filed in 2003 but his securities claim was found to be prescribed and the contract claims he asserted precluded because he attempted to bring the claims in a class action. *Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698 (5th Cir. 2004).

After his first suit, Miller filed this lawsuit in May, 2006. He is reasserting his redemption fees breach of contract claim and is adding the telephone charge (restriction on phone transfers) and securities law violation claims (alleging late delivery of a prospectus). The district court dismissed the complaint in part due to res judicata; however, the Fifth Circuit reversed, holding that Miller had not received a final adjudication on the merits of his fee claim because the prior dismissal was only jurisdictional. *Miller v. Nationwide Life Ins. Co.*, No. 06-31178, 2008 WL 3086783 (Aug. 6, 2008)(unpublished). *See Miller v. Nationwide Life Ins. Co.*, 2:06-cv-02334-JCZ-SS, Docket No. 109 (E. Dist. La. May 10, 2010).

[2] The term "variable annuity contract" shall mean any accumulation or annuity contract, any portion thereof, or any unit of interest or participation therein pursuant to which the value of the contract, either prior or subsequent to annuitization, or both, varies according to the investment experience of the Separate Account in which the contract participates. 17 C.F.R. § 270.0-1 (2006).

[3] Miller purchased two annuity contracts from Nationwide. One was a qualified annuity under § 403(b) of the Internal Revenue Code, the second contract was an ordinary deferred variable annuity. The contracts are identical for the purpose of this appeal.

No. 10-30859

and Miller contends that he relied on the information contained in the prospectus to buy the contracts. The prospectus provided information relating to the rights, benefits, and fees of the annuity contracts.

As an investor, Miller was interested in market timing[4] or short-term trading investment practices. The annuities Miller purchased were comprised of underlying sub-accounts; each of the sub-accounts corresponded with an underlying mutual fund. Upon purchase of the annuity contracts, Miller received documents from Nationwide; the documents included a Certificate Agreement, a data page, the body of the contract, a Summary of Participation, and other riders and amendatory endorsements. Miller's breach of contract claims on appeal are based on the language contained in the Summary of Participation. The Summary of Participation states in relevant part:

> Here is a summary of your rights. A more detailed description is provided in this Certificate Agreement (and any applicable endorsements). You have the right to:
> - transfer variable assets among the various funds without a charge;
> - make telephone exchanges where permitted by state law
>
> Your rights under this Certificate Agreement cannot be taken away from you. Your benefits under this Certificate Agreement cannot be denied.

The language above was important to Miller as he began to frequently transfer various assets from different sub-accounts. At times during the summer of 2001, Miller made trades on a weekly and sometimes daily basis.

---

[4] Market timing is the practice of frequent buying and selling of shares of a single mutual fund in order to exploit inefficiencies in the mutual fund pricing. According to the SEC, market timing is not illegal per se, but it can harm other investors and thus it is commonly barred or restricted by those in charge of mutual funds. *See SEC v. Tambone*, 597 F.3d 436, 439 (1st Cir. 2010). The SEC supports the imposition of redemption fees to curb market timing practices and has put into effect Rule 22c-2 to support that end. *See* e.g. 70 Fed. Reg. 13,328 (Mar. 18, 2005).

No. 10-30859

During this time Miller was often able to make trades between mutual funds without a fee. However, Miller learned in May, 2002 that Nationwide would begin charging a 1% redemption fee[5] for certain mutual funds where shares are re-sold by the contract holder after having been in the sub-account for less than sixty days. Nationwide updated and filed with the Securities and Exchange Commission (SEC) prospectuses that discussed potential new fees from certain mutual funds. Miller made small money transfers to see if Nationwide would actually charge a fee; after a trade, Miller was charged $45.63 on September 5, 2002. Miller continued trading and altered his trading strategy in order to avoid redemption fees.

In 2004, Nationwide limited the number of telephone and internet transfers Miller could make to twenty per year. This limitation also caused Miller to change his investing strategy as executing orders via U.S. mail or other courier would take more time and hinder him from taking advantage of market fluctuations.

On June 7, 2005, Miller transferred approximately $1.9 million to a sub-account corresponding to the Federated NVIT high income bond fund, a fee-charging fund. On June 14, his account was charged a 1% redemption fee of $18,837.03 when he transferred his assets out of the fund. Miller claims he did not know this fund would charge a fee and alleges that Nationwide violated U.S. securities law by failing to provide him with the May 1, 2005 prospectus until after June 7, 2005.

## Standard of Review

---

[5] A fee charged by a mutual fund on shareholders who sell fund shares within a short period of time. The time limit and size of the fee vary among funds, but the redemption fee usually is a relatively small percentage (1% or 2% of the amount withdrawn)...The intent of the redemption fee is to discourage rapid-fire shifts from one fund to another... *Dictionary of Finance and Investment Terms* 587-588 (8th ed. 2010).

No. 10-30859

This court has jurisdiction under 28 U.S.C. § 1291 and reviews the district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Golden Bridge Tech., Inc., v. Motorola, Inc.* 547 F.3d 266, 270 (5th Cir. 2008). The granting of summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). When the moving party has carried its burden, the non-moving party must demonstrate specific facts showing a genuine factual issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**Discussion**

a.

Miller alleges that Nationwide has breached its contract with Miller because redemption fees were imposed on his trades. Miller contends that the language in the Summary of Participation gives him the unrestricted right to transfer variable assets among the various funds without a charge. According to Miller, he owns two annuity contracts from Nationwide and does not have a contract with mutual funds. Thus, any redemption fee imposed on his account, whether it is imposed by a mutual fund or Nationwide, results in a breach of contract. In other words, his contract with Nationwide allows him to make trades without the burden of fees regardless of who is charging them.

Miller also contends that the district court was mistaken when it stated, "Miller's sole evidence" on whether Nationwide is charging redemption fees "seems to be a statement made by the SEC in the Federal Register dated March 18, 2005."[6] He disputes the findings of the district court and emphasizes that his

---

[6] Miller cited the Federal Register in his opposition to motion for summary judgment. He argues that he cited the Federal Register to clarify a statement made by Nationwide in its memorandum in support of its motion for summary judgment. Specifically, Nationwide stated, "The SEC explained first that the redemption fee would be imposed by the fund rather than pursuant to a contract issued by the insurance company." Miller wanted to clarify and point

best evidence in this case is his contract with Nationwide, which specifically guaranteed Miller the right to "transfer variable assets among the various funds without a charge."

Nationwide's position is that the imposition of redemption fees by mutual funds, and not Nationwide, cannot result in a breach of contract with Miller. Mutual funds are independent, third-party entities and are not under its control. Nationwide also argues that Miller cannot show that Nationwide was obligated to step in and pay on behalf of Miller or absorb the fund-imposed fees. Since mutual funds began imposing fees, Nationwide has collected and remitted them to mutual funds. It has never retained the redemption fees for itself.[7] The prospectuses provided by Nationwide confirm that selected funds will charge fees on short-term trading.[8]

The evidence shows that Nationwide is not the party who is actually charging its customers redemption fees. And because Miller could not point to any evidence showing that Nationwide could either decline to pass on the funds' fees or that mutual funds gave Nationwide discretion to waive fees for its customers, Miller's breach of contract claim against Nationwide lacks merit.

*Charging of Redemption Fees*

Miller's breach of contract claim turns on whether Nationwide imposed redemption fees when Miller engaged in short-term trading. Miller does not point to any evidence that could reasonably charge Nationwide with the duty to

---

out that Miller's first suit (which was cited as authority by the SEC in this Register) should not be cited as authority that the funds, and not the insurance companies, would be imposing fees.

[7] Nationwide has produced evidence to show that mutual funds, not Nationwide, actually imposed fees. The May 1, 2002 prospectus lists funds that charge fees.

[8] By 2002-2003, the SEC became concerned with short-term trading or market timing in mutual funds. SEC, *Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings*, Proposed Rule, 68 Fed. Reg. 70,402, 70,404 (Dec. 17, 2003).

pay for fund-imposed redemption fees or a duty to absorb fees. "The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(citing to Fed. R. Civ. P. 56(c)). Once the moving party has demonstrated that there is lack of evidence to support the non-moving party's cause, the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002); Fed. R. Civ. P. 56(e). "Once a properly supported motion for summary judgment has been made, the non-moving party may not rest upon mere allegations of denial in its pleadings but must instead set forth "specific facts" showing there is a genuine issue for trial." *S.E.C. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

Nationwide has produced documents to demonstrate that it has not been imposing redemption fees and Miller has failed to produce supporting evidence to link the imposition of fees to Nationwide. There is no evidence that Nationwide charged Miller redemption fees. The district court did not see a triable issue of fact on the evidence produced before it and Miller on appeal reasserts the same language from the Summary of Participation document to allege a breach of contract.

On the other hand, Nationwide produced an affidavit from Mr. Daniel R. Zavorek, a Senior Analyst in the Regulatory, Research, & Reporting Group, who handles documentation related to process and procedures at Nationwide, and prospectuses that discuss imposition of fees from mutual funds. The Certificate Agreement document, which includes the Summary of Participation on which Miller bases his claim, also supports Nationwide's position. Mr. Zavorek's affidavit and Nationwide's May 2002 prospectus point out that certain mutual funds impose fees; Miller has not produced any evidence to refute this. In fact, in his own deposition, Miller acknowledged that mutual fund management fees were paid by contract owners to the mutual funds.

No. 10-30859

Although Miller cites to the language in the Summary of Participation page to support his position of an unrestricted right to transfer funds without any charge, another provision in the Certificate Agreement suggests otherwise. The "Variable Account Certificate Value" provision provides that, "If...*charges* or *deductions* are made against the Variable Account Certificate Value; then, an appropriate number of Accumulation Units will be cancelled or surrendered to equal such amount." (Emphasis added).  Hence, the Certificate Agreement contemplates potential charges made against a contract owner's account and provides that Nationwide will pass on such charges to the contract owner.  And the very Summary of Participation page on which Miller relies states that, "[h]ere is a summary of your rights...[a] more detailed description is provided in this Certificate Agreement..."  Thus, this language, which is located just a few centimeters above the bullet points on which Miller bases his entire contract claim, would have led Miller to the Certificate Agreement.  Assuming that the Summary of Participation  forms a part of the Certificate Agreement, the only reasonable reading of Miller's right to "transfer variable assets among the various funds without a charge" is that Nationwide cannot impose charges on Miller's trading activities.  This provision does not address third-party mutual fund fees and it would be unreasonable to conclude that Nationwide intended to assume responsibility for mutual fund-imposed fees.  Nor can we  assume that Nationwide intended to make promises on behalf of independent mutual funds that redemption fees would NOT be imposed.  The language of the Certificate Agreement simply does not support such an interpretation inasmuch as contracting parties make promises regarding their own actions, not the actions of independent third-parties.   "The interpretation of a contract is the determination of the common intent of the parties."  La. Civ. Code art. 2045.  Under Louisiana law, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search

8

of the parties' intent." La. Civ. Code art. 2046. Miller's interpretation of the annuity contracts flies in the face of a common sense reading of the contract language.

Miller has failed to produce evidence showing that Nationwide is the party charging redemption fees, nor has he argued that Nationwide has the discretion to either decline passing on mutual fund fees or has the authority to waive such fees for its customers.[9] The record does not support Miller's contention that Nationwide imposed fees and breached its contract.

*Duty to Pay or Absorb Redemption Fees*

Miller did not argue the alternative theory of whether Nationwide is obligated to step into the shoes of Miller and pay the fund-imposed fees on Miller's behalf. The district court introduced this alternative theory in its analysis to determine if Nationwide could be in breach despite not imposing redemption fees.

The Summary of Participation document, which Miller cites as evidence for his contract claim, does not create any duty for Nationwide to pay third-party imposed redemption fees or for Nationwide to absorb fees. The language on which Miller relies says that the Certificate Owner (Miller) has the right to "transfer variable assets among the various funds without a charge." The language here does not create any contractual duty on Nationwide to pay or absorb redemption fees on behalf of Miller nor do the more detailed portions of the contract hint at such a duty. The district court offered an alternative theory

---

[9] Miller cites to the Federal Register, 71 Fed. Reg. 58257, 58262 n. 50 (Oct. 3, 2006), as authority to argue that mutual funds could choose to decline imposing redemption fees on customers who are already in existing contract relationships with insurance companies for concern of litigation resulting from such fees. The district court correctly pointed out that the Federal Register does not demonstrate whether Nationwide has the discretion to waive redemption fees because Nationwide is an insurance company, not a mutual fund. Miller has not produced evidence that suggests underling mutual funds are willing to waive fees on Miller's transactions or whether Nationwide was given the power to do so.

for Miller's breach of contract claim; Miller did not make this argument in its opposition to Nationwide's motion for summary judgment nor does Miller advance this argument on appeal.[10] Miller has therefore waived this alternative theory on his breach of contract claim by failing to brief the argument on appeal. *Robinson v. Guarantee Trust Life Ins. Co.*, 389. F.3d 475, 481 n.3 (5th Cir. 2004)(the court noting that a failure to adequately brief an issue on appeal constitutes waiver of that argument); *U.S. v. Thames*, 214 F.3d 608, 611 n.3 (5th Cir. 2000)(the panel asserting that issues not adequately briefed must be waived).

In support of his breach of contract claim, Miller also attempts to argue that the Mortality and Expense Risk Charge section of the contract was violated because of fund-imposed fees. The essential language Miller relies on in this section states, "the expense risks involves the guaranty by the Company that it will not increase charges for administration of the contract regardless of the Company's actual administrative expenses." This section of the contract relates to Nationwide's guarantee that it will not increase administrative expenses related to the contract even if its actual costs or expenses increase. In other words, Nationwide promised that it will not increase administrative charges even if its actual expenses increase. This section of the contract to which Miller cites is wholly unrelated to the issue of redemption fees and offers no support to Miller's breach of contract claim.

---

[10] Miller's brief disclaims the alternative theory offered by the district court. Miller argues, "The district court erred when it stated: Miller has not pointed to any evidence that Nationwide...*Therefore, Miller's breach of contract claim against Nationwide turns on whether the contract obligates Nationwide to absorb or pay third-party redemption fees that Miller incurs when he trades in fee-imposing funds.* (Emphasis added). Miller disclaims the alternative theory to his contract breach claim and reiterates his original argument - that Nationwide had a contractual duty under the language of the Summary of Participation document to not charge redemption fees.

*Summary of Participation*

Miller's entire breach of contract claim rests on the language contained in the Summary of Participation document.  In both his appellate brief and reply brief, Miller cites to the Summary of Participation numerous times to make the argument that he had an unrestricted right to trade between sub-accounts under the contract and that any fee imposition would result in breach. The district court considered whether the Summary of Participation is part of the contract. Nationwide took the position that the Summary of Participation is not part of the contract but the district court included the Summary as part of the contract because: (1) Nationwide did not point to legal authority that disposes of the issue, and (2) Nationwide's own documentation was not clear on whether the Summary was a part of the contract.

As the party bringing a breach of contract claim, Miller has the burden to show that the Summary of Participation is actually a part of the contract. *See Vignette Publ'n, Inc. v. Harborview Enters., Inc.*, 799 So. 2d 531, 534 (La. Ct. App. 2001)(holding that the party claiming rights under the contract has the burden of proof in a breach of contract claim).  However, for Miller's breach of contract claim, even if the Summary of Participation is included as part of the contract, we reach the same result:  no duty was created obligating Nationwide to pay mutual fund-imposed redemption fees.  As discussed above, the language in the Summary of Participation means that Nationwide cannot charge Miller a fee for trades.  It does not create a duty of unlimited exposure requiring Nationwide to pay redemption fees for Miller every time Miller is charged for making market time, short-term trades. Miller, at his deposition, demonstrated that he knew of mutual fund "management fees" and that these fees go to mutual funds.   Some mutual funds that correspond to sub-accounts in Nationwide's variable annuities charge fees and they were fully disclosed in the

prospectus for the Separate Account[11] associated with the variable annuity contracts and the mutual fund prospectuses themselves.

Miller heavily relies on the language, "transfer variable assets among the various funds without a charge," but this does not mean Nationwide had a contractual duty to pay redemption fees. Therefore, even if the Summary of Participation is included as part of the contract, Miller has failed to show that Nationwide is in breach.

**b.**

Turning to Miller's second contract claim, he argues that Nationwide violated his right under the contract when it restricted him to twenty telephone transfers per year. Miller's contention is that the language in the Summary of Participation document, "the right to make telephone exchanges where permitted by state law," gives him the unlimited or unrestricted right to make telephone exchanges. But the contract does not contain language that would give Miller the right to unlimited telephone transfers. In fact, the contract and prospectus sent to Miller state that Nationwide reserves the right to withdraw telephone exchanges and limit transfers in general.

As with his redemption fee claim, Miller bases his telephone restriction breach of contract claim on the language contained in the Summary of Participation page. Specifically, Miller relies on the language: "[y]ou have the right to make telephone exchanges where permitted by state law." This statement does not contain the terms "unlimited" or "unrestricted." The plain reading of this language is that Miller is allowed to make telephone transfers

---

[11] "The term 'Separate Account' shall mean an account established and maintained by an insurance company pursuant to the laws of any state or territory of the United States, or of Canada, or any province thereof, under which income, gains and losses, whether or not realized, from assets allocated to such account, are in accordance with the applicable contract credited to or charged against such account without regard to other income, gains, or losses of the insurance company."  17 C.F.R. § 270.0-1 (2006).

wherever the law allows, but it does not discuss any promise for unlimited telephone trades. Louisiana Civil Code article 2045 provides that, "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."). Miller does not point to any evidence that shows that Nationwide did in fact make a promise of unlimited telephone transfers or that Nationwide intended to offer Miller a right to unlimited telephone transfers.

In addition to the contract's not promising unlimited or unrestricted telephone transfers, the May, 2001 prospectus that was sent to Miller, and on which he relied[12] to purchase his annuity contracts, unequivocally states that telephone and internet exchange privileges may be withdrawn upon notice. The district court pointed out that although the prospectus does not form part of the contract, Miller relied on it and Nationwide's right to withdraw telephone transfer privileges was clear. We agree with the district court and do not see any reason to disturb its holding.

Finally, the Summary of Participation states that the contract holder has the right to "make telephone exchanges where permitted by state law." Nationwide decided to limit Miller's telephone transfers in light of complaints[13] of trading abuse from investment companies. Nationwide limited Miller's

---

[12] Miller asserted in his Complaint that Nationwide delivered its prospectus to Miller before he bought the contracts and he relied on it when making the purchase. Miller also stipulated that he relied on the May 1, 2001 prospectus to inform him of the terms of the contract.

[13] The record shows complaint letters sent to Nationwide: A letter from Fidelity Investments (dated 12/27/2006) and an e-mail from American Century Investment Services (dated 5/16/2007) both discussing potential harm to funds resulting from short-term trading practices. American Century Investment Services requested Nationwide to take action to limit such trading practices.

telephone transfers to twenty per year and there is no inconsistency with what Nationwide did and the language contained in the Summary of Participation: "make telephone exchanges where permitted by state law." Thus, after Nationwide applied telephone transfer restrictions, Miller may now make up to twenty telephone transfers per year, wherever it is permitted by state law. The language in the Summary of Participation can co-exist with the restriction put in place by Nationwide, hence there is no breach of contract based on telephone restrictions.

**c.**

Finally, in considering Miller's third claim, he argues that he incurred a redemption fee because Nationwide failed to timely provide him with its prospectus, which resulted in a violation of the Securities Act of 1933, 15 U.S.C. §77e(b)(2). On or about June 7, 2005, Miller transferred approximately $1.9 million dollars to the Nationwide sub-account holding Federated NVIT high income bond fund (Federated NVIT). On June 14, 2005, Miller transferred that money to another sub-account and was charged a redemption fee of $18,837.03. Miller contends that he was charged this fee because Nationwide failed to timely provide him with its prospectus, violating 15 U.S.C. §77e(b)(2). 15 U.S.C. §77e(b)(2) states in relevant part:

> It shall be unlawful for any person, directly or indirectly–
>> [T]o carry or caused to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

Section 77e(b)(2) deals with the sale of securities. Miller transferred his money into the Federated NVIT and was charged a redemption fee when he transferred his money out of that fund several days later. By Miller's own explanation, there was no sale of security to him and thus this statutory rule is inapplicable. Miller merely transferred existing money into a sub-account

corresponding to a Federal Bond; the transaction on June 7, 2005 did not involve a purchase of an annuities contract.[14] *See Miller v. Nationwide Life Ins. Co.*, No. 062334, 2010 WL 3168052 at 3 (E.D. La. Aug. 9, 2010).  If Nationwide was not offering for sale an annuities contract, it was not obligated to send a prospectus. Miller also contends that 15 U.S.C. §77e(b)(2) required Nationwide to send a prospectus either prior to or with the offer to transfer into the Federated NVIT. Because an annuity contract was not sold, Miller may be suggesting that the underlying mutual fund was required to send a prospectus before he transferred money into the Federated NVIT fund.  If this is what Miller suggests, he does not argue that the underlying mutual fund failed to properly send its prospectus to him.  Miller does, however, stipulate that he did receive the prospectus after he ordered the June 7 transfer.  Nationwide also produced evidence, which has not been contradicted by Miller, that Nationwide Investment Services Corporation (NISC) sent Miller a confirmation letter for his June 7 trade, and it is standard operating procedure to send the Federated NVIT prospectus because it was Miller's first transfer into the fund.  Miller contends that according to 15 U.S.C. §77e, he should have received a prospectus either before or at the same time of the transfer.  But 15 U.S.C. §77e allows for the prospectus to be delivered after sale.  *Byrnes v. Faulkner*, 413 F. Supp. 453, 472 (S.D.N.Y 1976)("It was clearly within the contemplation of the drafters of the statute that a purchaser might not see the prospectus covering the security he purchased until after the sale had been completed.").

Finally, the district court correctly found that Miller's claim lacks causation.  The court held:

---

[14] Miller contends that the district court got it wrong when it held that the June 7 transaction did not involve the purchase of the annuity contract itself.  He asserts that mutual funds are securities for the purpose of securities law.  Miller, however, fails to cite to statutory authority or case law to support this position.

Causation is problematic regardless of which prospectus -- BOA annuity or Federated Bond Fund -- Miller relies upon for his claim. Section 77e does not purport to establish liability for damages based on a technical violation (assuming *arguendo* that one even exists here) in the absence of causation.  Miller does not attest that he even attempted to consult the May 1, 2005, BOA Fund prior to making the June 7th trade. Had he made such an attempt then he would have immediately realized that his prospectus was more than a year old. Given what Miller knew about the potential for redemption fees it seems that he surely would have taken simple steps either via the internet or phone to verify whether the Federated Bond Fund charged a redemption fee.  So Miller either did not attempt to consult the prospectus at all or he made such an attempt, learned that his prospectus was not current, and yet chose to trade $1.8 million dollars in the blind without taking the time to obtain information that should have been readily available from other sources.

2010 WL 3168052 at 4.  As an experienced investor who was already knowledgeable of redemption fees,[15] checking with the fund before moving his money would have been the prudent thing to do.

For the foregoing reasons we AFFIRM the district court's holding on all claims.

---

[15] Miller, in his deposition, admitted to paying a 1% redemption fee on September 5, 2002 and again on June 14, 2005.  He also admits to having expertise in the areas of the stock market and investments.